2000 SD 28

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Mark MILK, Defendant and Appellant.**

**No. 20869.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 10, 2000.

Decided Feb. 23, 2000.

Mark Barnett, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

John A. Schlimgen of Stuart, Gerry & Schlimgen, Sioux Falls, South Dakota, Attorneys for defendant, and appellant.

GILBERTSON, Justice

[¶ 1.] Defendant Mark Milk (Milk) appeals a life sentence for first-degree manslaughter as cruel and unusual punishment. Milk also appeals the trial court's denial of his motion to reopen the resentencing hearing to present psychological testimony. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] On the morning of October 3, 1993, Milk, age 19 was involved in several altercations with Shawn Peneaux (Peneaux) outside of the John King Memorial Dance Hall in Winner, South Dakota. At approximately 1:30 a.m. Winner police officers were called to the dance hall to respond to a possible knife fight. Bystanders testified at the grand jury proceeding that Milk and Peneaux had gotten into a fight, and that Milk had a knife. When the police arrived however, the fight broke up and Milk threw the knife into the ditch. No one was injured by the knife at this time. After the dance, Milk began to walk home his girlfriend Renee Foote. During this

walk, Peneaux and some of his friends confronted Milk and Foote.

[¶ 3.] The State and Milk disagree as to what happened next. Milk claims Peneaux and he began talking, when Peneaux hit him above the eye with a rock. A fight began and Peneaux got on top of Milk, with one hand on his throat and one hand hitting him in the face. Milk alleged Peneaux called to his friends to come over and help him. At that time, Milk grabbed his knife and stabbed Peneaux in the chest, in the side, and three more times in the back. Milk had to roll Peneaux off of him. Milk then began kicking Peneaux in the head and face, as Peneaux tried to get up. Milk also hit Peneaux in the face twice with the knife. Milk then ran to catch up with Foote.

[¶ 4.] Foote testified at the grand jury proceeding that she only saw an initial fight, when Peneaux and his friends accosted Milk. Foote testified she and the others ran away, but, before she left she saw Milk kick Peneaux twice. Milk was wearing steel-toed combat boots. A short time later, Milk caught up with Foote on her way home. Foote testified Milk told her he had beat-up Peneaux and kicked him in the head until "his head was soft." At this time, Milk was acting "[s]haky . . .," "[s]cared, nervous." However, Foote testified that once Milk had seen her home, he went back to find Peneaux. Milk later came back to Foote, at which point Milk told her he had stabbed and killed Peneaux. Milk stated one of the stab wounds went through Peneaux's body from front to back and scraped the pavement.[1]

[¶ 5.] Peneaux died sometime during the early morning hours of October 3, 1993 on a street in Winner. His body was found by the police at approximately 6:00 a.m. on October 3. Peneaux's face was lacerated and bruised, and he had been repeatedly stabbed and slashed, including a series of cuts from ear to ear. The top of his right ear had been cut off as well. The autopsy report indicates:

> The cause of death, therefore, was hemothorax secondary to multiple stab wounds to the chest. Although the beating sustained by the decedent to the head and face was quite significant, an [sic] undoubtedly contributory to the death, these injuries did not appear to be immediately life threatening. The manner of death is consistent with homocide [sic].

Peneaux bled to death from deep knife thrusts to his chest, which caused massive internal bleeding.

[¶ 6.] Milk was interviewed by police officers later the same morning.[2] When law enforcement spoke with Milk, Milk admitted to the stabbing and killing, but indicated it was in self-defense, because Peneaux

---

1. The autopsy report indicates there was an eight-inch deep wound in which a knife had penetrated from the back of Peneaux's armpit, through the ribs, across the lungs, between two ribs on his right side, before penetrating the chest wall again.

2. It did not take long for the investigation to center on Milk, because he had made several incriminating statements. Jason Brandis, an acquaintance of Milk's, testified Milk bragged to him about killing Peneaux. He testified Milk stated, "That's what the mother fucker gets for fucking with me. That's what any mother fucker will get for fucking with me." Brandis also testified Milk had described the act: "[Milk] said he stabbed him through the heart with a knife and he said he cut his throat and stabbed him through the mouth and he cut a piece of his ear off."

Brandis also testified he had met Milk earlier in a bar the night of October 2. Milk told Brandis if anybody wanted "to fuck around with him" he would stab them. Milk showed Brandis the knife he was carrying and stabbed the table and seat he was on. Jeremy Brandis confirmed these actions. At one point Milk shaved some of Brandis' hair off with the knife, grabbed his ear and, putting the knife to the ear, asked if he could cut it off.

Last but not least, Brandis testified at the grand jury proceeding that Milk had instructed him to tell the police Waylen Eagle Star and his brothers had killed Peneaux. Milk offered to trade a pair of Nike shoes to Brandis, in exchange for a pair of boots for this favor.

had him by the throat.[3] Milk also claimed to be very drunk at the time of the killing. However, the testimony of Brandis painted a very different picture. He testified Milk was faking intoxication the night he killed Peneaux. In contrast, Peneaux was heavily intoxicated. Brandis testified that he had observed Peneaux after the first fight with Milk, "pretty well passed out sitting on the bench with his head between his knees." Milk even threw beer cans, beer bottles, and an ashtray at Peneaux, hitting him in the back. Peneaux did not respond, just laying there while Milk yelled for him to get up. Peneaux's blood alcohol level at the time of his death was .30.

[¶ 7.] Milk was arrested for the first-degree murder of Peneaux on October 4, 1993. On October 8, 1993, the grand jury indicted Milk on four alternative homicide counts: (Count I) premeditated first-degree murder; (Count II) second-degree murder; (Count III) first-degree manslaughter committed without a design to effect death, and in heat of passion but in a cruel and unusual manner; and (Count IV) first-degree manslaughter with a deadly weapon.

[¶ 8.] Pursuant to a plea agreement, Milk pleaded guilty to Count III, first-degree manslaughter under SDCL 22–16–15(2). The other counts were dismissed. The trial court sentenced Milk to life without parole, the maximum penalty for the Class I felony Milk had committed. The trial court made no finding that Milk was or was not able to be rehabilitated, but stated his actions in the penitentiary would influence whether he could get his sentence commuted with the prospect of parole. The judgment of conviction and sentence reflecting the imposition of life imprisonment was filed on January 12, 1994.

[¶ 9.] Milk did not appeal this sentence. However, he did file an amended petition for writ of habeas corpus on April 30, 1997. Milk's petition for habeas corpus included several claims, including that his life sen-

tence constituted cruel and unusual punishment. At this time, Milk also submitted a motion for appointment of an expert, Dr. Stephan Langenfeld, a Sioux Falls psychologist. Dr. Langenfeld was prepared to provide evidence that Milk could be rehabilitated. After a hearing, the habeas court denied this motion. However, the habeas court did order the trial court to resentence Milk, finding the trial court did not adequately consider Milk's potential for rehabilitation. The trial court held the resentencing hearing on August 17, 1998. The trial court issued a memorandum opinion on September 9, 1998, in which it reimposed a life sentence on Milk. On October 1, 1998, Milk filed a motion to reopen the hearing, requesting an order "allowing him to reopen his habeas corpus hearing for the purpose of presenting the testimony of an additional witness." The trial court denied this motion. Milk appeals raising the following issues for our consideration:

1. Whether Milk's sentence constitutes cruel and unusual punishment.

2. Whether the trial court abused its discretion in denying Milk's motion to reopen the resentencing hearing.

## STANDARD OF REVIEW

[¶ 10.] This Court gives great deference to sentencing decisions made by trial courts. *State v. Gehrke*, 491 N.W.2d 421, 422 (S.D.1992) (citing *State v. Weiker (Weiker II)*, 366 N.W.2d 823, 828 (S.D. 1985) (citing *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980))). Not every felony sentence will be subjected to exhaustive review. *Id.* (citing *Weiker II*, 366 N.W.2d at 827). We have previously stated:

[W]e do not adopt or imply approval of a general rule of appellate review of sentences. Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence; rather, in applying the Eighth Amendment the ap-

---

**3.** No handprints or marks were found on Milk's neck.

pellate court decides only whether the sentence under review is within constitutional limits. In view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate.

*Id.* at 423 (citing *Weiker II,* 366 N.W.2d at 827 (quoting *Solem v. Helm,* 463 U.S. 277, 290 n.16, 103 S.Ct. 3001, 3009 n.16, 77 L.Ed.2d 637, 649 n.16 (1983))). " '[S]uccessful challenges to the proportionality of· particular sentences [will be] exceedingly rare.' " *State v. Bonner,* 1998 SD 30, ¶ 14, 577 N.W.2d 575, 579 (citing *Solem,* 463 U.S. at 289–90, 103 S.Ct. at 3009, 77 L.Ed.2d at 649 (noting reviewing courts should give substantial deference to legislatures in determining the types and limits of punishments for crimes and the discretion trial courts possess in sentencing)).

[¶ 11.] Trial court rulings on motions to reopen civil cases to permit additional evidence are reviewed under the abuse of discretion standard. *Sabhari v. Sapari,* 1998 SD 35, ¶ 27, 576 N.W.2d 886, 895. "While the particular criteria that guide a trial court's decision to reopen are necessarily flexible and case-specific, it is generally understood that a trial court abuses its discretion if its refusal to reopen works an 'injustice' in the particular circumstances." *Id.* (citing *Rivera–Flores v. Puerto Rico Tele. Co.,* 64 F.3d 742, 746 (1st Cir.1995)). A trial court has a wide discretion in passing on a motion to reopen. *Endres v. Endres,* 532 N.W.2d 65, 72 (S.D. 1995) (citing *Rosen's Inc. v. Juhnke,* 513 N.W.2d 575, 577 (S.D.1994) (quoting 88 C.J.S. *Trial* § 104 (1955))). Although this is a criminal case, there is no justification to depart from this standard of review.

### ANALYSIS AND DECISION

[¶ 12.] **1. Whether Milk's sentence constitutes cruel and unusual punishment.**

[¶ 13.] Milk argues his life sentence for first-degree manslaughter is cruel and un-usual punishment and violates the Eighth Amendment to the United States Constitution.

[¶ 14.] Recently we reiterated the limited principles of constitutional sentence review:

Recently this Court altered its approach to examination of sentences that purportedly violate the Eighth Amendment prohibition against cruel and unusual punishment. [*Bonner,* 1998 SD 30, ¶ 13, 577 N.W.2d at 575]. No longer will the "shock the conscience" test be applicable to federal constitutional analysis under the Eighth Amendment. *Id.* Instead, proportionality review will be guided by "common principles" identified by Justice Kennedy in the Supreme [C]ourt's latest pronouncement on this issue. *Id.* ¶¶ 15–16 (referring to *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)) (modifying [*Solem,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637] ). These principles are as follows:

(1) reviewing courts must grant substantial deference to the legislature's broad authority to determine the types and limits of punishment; (2) the Eighth Amendment does not mandate adoption of any one penological theory; (3) marked divergences "are the inevitable, often beneficial result of the federal structure"; and (4) proportionality review by federal courts should be informed by objective factors.

*State v. Hinger,* 1999 SD 91, ¶ 16, 600 N.W.2d 542, ·547 (citing *Gehrke,* 491 N.W.2d at 423 n. 2 (citing *Harmelin,* 501 U.S. at 998–1001, 111 S.Ct. at 2703–04, 115 L.Ed.2d at 867–68)). *Hinger* and *Bonner* set forth the following steps to utilize in our review of whether a sentence is cruel and unusual:

[T]o assess a challenge to proportionality we· first determine whether the sen-

tence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the legislature and the sentencing court. If these circumstances fail to suggest gross disproportionality, our review ends. If, on the other hand, the sentence appears grossly disproportionate, we may, in addition to examining the other *Solem* factors, conduct an intra, and interjurisdictional analysis to aid our comparison or remand to the circuit court to conduct such comparison before resentencing. We may also consider other relevant factors, such as the effect upon society of this type of offense.

*Id.* (quoting *Bonner,* 1998 SD 30, ¶ 17, 577 N.W.2d at 580).

■ [¶ 15.] Milk was convicted of SDCL 22–16–15(2), a Class I felony carrying with it a maximum penalty of life imprisonment. SDCL 22–6–1(3). Although Milk received the most severe sanction for his offense, his sentence is within the statutory range. After this Court's decision in *Bonner,* the question becomes whether the "most severe" sanction was reserved for "the most serious combinations of the offense and the background of the offender." *Hinger,* 1999 SD 91, ¶ 20, 600 N.W.2d at 548 (citing *Bonner,* 1998 SD 30, ¶ 25, 577 N.W.2d at 582).

[¶ 16.] Also, an appropriate sentence requires that:

The sentencing court should "acquire a thorough acquaintance with the character and history of the man before it." This study should examine a defendant's "general moral character, mentality, habits[,] social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record."

*Id.* ¶ 21 (citing *Bonner,* 1998 SD 30, ¶ 19, 577 N.W.2d at 580 (other citations omitted)).

[¶ 17.] We take into consideration this is Milk's first felony conviction. However, it is obvious from Milk's presentence investigation report he is no stranger to the criminal justice system.[4] After an examination of all the circumstances in this case, we do not find that Milk's life sentence is grossly disproportionate.

■ [¶ 18.] Milk argues that this Court has held rehabilitation is a factor that must be ruled out before a life sentence may be imposed. We have held that a life sentence should only be imposed when a trial court:

[C]an determine from the facts of the principal offense and the previous convictions that rehabilitation is so unlikely as to be removed from consideration in sentencing; that the interests of society demand that the convict be kept off the streets for the rest of his life ... and that the life sentence not constitute excessive retribution. [*State v. Pulfrey,*

---

4. Milk's criminal record is as follows:
1. Exhibition Driving, Tripp County, 7/15/92
2. Disorderly Conduct, Tripp County, 8/12/92
3. Exhibition Driving, Tripp County, 8/12/92
4. Racing on Highway, Tripp County, 8/12/92
5. Failure to Make Proper Stop at Stop Sign, Tripp County, 10/15/92
6. Possession of Alcohol by Minor, Tripp County, 10/30/92
7. Open Container, Tripp County, 10/30/92
8. Possession of Alcohol by Minor, Tripp County, 1/29/93
9. Possession of Alcohol by Minor, Tripp County, 1/29/93
10. Vandalism–3rd Degree, Tripp County, 6/23/93
11. No Drivers License, Gregory County, 3/15/90
12. Exhibition Driving, Tripp County, 10/09/90
13. Speeding, Gregory County, 5/2/91
14. Speeding, Tripp County, 9/24/92
15. Speeding, Tripp County, 8/7/92
16. Burglary–3rd Degree/Enter or Surreptitiously Remain in, Tripp County, 3/10/93
17. Possession of Alcohol by Minor, Tripp County, 9/15/93

1996 SD 54, ¶ 18, 548 N.W.2d 34, 38] (citations omitted).

*Id.* ¶ 23, 600 N.W.2d 549 (citing *State v. Peterson*, 1996 SD 140, ¶ 29, 557 N.W.2d 389, 395). Milk misconstrues this rationale in light of *Bonner*. It is not a bright-line rule, which must be considered in every case before a life sentence may be imposed. Upon review we will address this subject only if we initially determine that there is a gross disproportionality in the sentence. *Bonner*, 1998 SD 30, ¶ 17, 577 N.W.2d at 580. "If these circumstances fail to suggest gross disproportionality, our review ends." *Id.* Clearly there are some acts of such a criminal magnitude that they justify a life sentence whether the perpetrator is capable of rehabilitation or not. In such instances the sentence is not disproportionate to the crime.[5]

5. Even if Milk were to clear the hurdle of disproportionality, his claim of potential for rehabilitation is not supported by the record. A great amount of the re-sentencing hearing was spent on this subject. Unlike this Court's review in *Hinger*, our review in this case is not hindered by the absence of specific findings on the issue of Milk's amenability to rehabilitation. *See Hinger*, 1999 SD 91, ¶ 24, 600 N.W.2d at 549. At the resentencing hearing, the trial court examined Milk's progress report from the penitentiary dating back to September 9, 1997. This report indicated Milk had been disciplined for twenty-five minor infractions since his admission and one major violation, consisting of insolence in the form of telling a guard, "Get the fuck out of my way," when the guard was standing in his cell's entrance. While on the stand, Milk did testify he had committed approximately twenty-five disciplinary infractions, however, despite this record, Milk stated he had no problems with authority. Milk also repeatedly testified he had no other disciplinary infractions, and none since June 1997. After the hearing, the trial court acquired an updated progress report from the penitentiary. The report indicated, contrary to Milk's repeated statements under oath, he had committed a "disruptive conduct" disciplinary violation on July 17, 1998, punished by five days' loss of various privileges. The trial court also took into consideration Milk had completed his GED shortly after admission to the penitentiary, and had obtained a job working in the prison's laundry department.

[¶ 19.] The trial court noted this was one of the most vicious, brutal homicides it has ever seen. While the autopsy report indicates Peneaux's death was likely caused by the stab wounds to the chest, there is evidence in the record Peneaux may have been attempting to get up when Milk proceeded to kick him in the head and face until his "head was soft." Peneaux's throat was repeatedly slashed and part of his ear had been cut off. Based on the prior conversation between Milk and Brandis, the ear was apparently cut off not in the heat of battle but as a trophy of the conquest. The photographic evidence in this case clearly indicates Milk went well beyond merely "defending" himself. In addition, Milk bragged to a friend if anybody wanted "to fuck around with him" he would stab them. The facts and evidence of this case are wrought with violence and menace. *Compare Bonner*, 1998 SD 30,

The trial court also found that Milk has not shown there is any reasonable likelihood of rehabilitation:

. . . .

16. Rehabilitation is so unlikely that it should be removed from consideration in sentencing. The interests of society demand that Milk be kept off the streets for the rest of his life.

17. The offense is so malignant that a lifetime of incarceration is the only adequate retribution.

The issue of whether Milk is capable of rehabilitation is a fact question to be decided by the trial court. *Id.* (citing *Pulfrey*, 1996 SD 54, ¶ 20, 548 N.W.2d at 39). It is clear from this record the trial court expressly found Milk had no rehabilitative prospects and left his life sentence for the first-degree manslaughter offense intact. The trial court correctly acquired a thorough acquaintance with Milk's character and history and considered all of the appropriate factors required in *Bonner*. 1998 SD 30, ¶ 19, 577 N.W.2d at 580 (citing *State v. Chase in Winter*, 534 N.W.2d 350, 354–55 (S.D.1995)). Milk did not object to any of the information contained in the presentence investigation, upon which the court relied in sentencing. We recognize most of Milk's criminal record consists of misdemeanors, however, this "will not necessarily excuse or mitigate his sentence." *Id.* ¶ 23, 577 N.W.2d at 582.

¶ 24, 577 N.W.2d at 582 (holding sentence was found grossly disproportionate especially in the absence of violence and menace). Milk took another human life by use of a deadly weapon—a knife with a blade long enough to make incisions in Peneaux's body up to eight inches deep. *Compare Bult v. Leapley,* 507 N.W.2d 325, 328 (S.D. 1993) (Bult's case was distinguished from other life term cases because he did not inflict substantial bodily injury or use a deadly weapon.). After stabbing Peneaux to death, instead of showing remorse, Milk bragged about it to anyone who would listen.

[¶ 20.] In light of the record before us, the life sentence does not constitute cruel and unusual punishment. The judgment of conviction and sentence is affirmed.

[¶ 21.] **2. Whether the trial court abused its discretion in denying Milk's motion to reopen the resentencing hearing.**

[¶ 22.] Milk argues the trial court abused its discretion when it denied his motion to reopen the resentencing hearing to allow testimony of psychologist Stephan Langenfeld. Dr. Langenfeld was appointed by the habeas court at the request of Milk on May 19, 1997, over one year before the resentencing hearing. On March 23, 1998, the trial court approved payment of $835 for Dr. Langenfeld's reports and testing done for the purpose of evaluating Milk's rehabilitation potential in November and December 1997. The resentencing hearing was held on August 17, 1998, and the trial court issued its memorandum opinion on September 9, 1998. Milk's motion to reopen the hearing was not filed until October 1, 1998. Milk stated in this motion that he could have asked for a continuance but chose not to do so. Milk affirmatively chose to proceed without Dr. Langenfeld's testimony at the time of the resentencing hearing.

[¶ 23.] In *Endres,* this Court reviewed a trial court's decision not to reopen the divorce trial upon husband's motion. 532

N.W.2d at 72. In affirming the trial court's decision, we stated: "[w]e note Husband could have scheduled this examination prior to trial or requested a continuance if he felt such would provide evidence relevant to a marital property disposition." *Id.* Similarly, in this case, Milk could have either called Dr. Langenfeld as a witness at the time of the hearing or asked the court for a continuance. Instead, Milk attempted to present this evidence approximately one month after the court had issued its memorandum decision re-sentencing him to life imprisonment. Neither is this a situation where the trial court refused to reopen evidence on the second day of a two-day trial. *See Albers v. Kuper,* 518 N.W.2d 745, 747 (S.D.1994). We note the trial court's statements at the close of the resentencing hearing indicate it was willing to listen to anything Milk wanted to present:

> Mr. Schlimgen: . . . And those are the things the Court should bear in mind when he fashions a sentence. I'll make a recommendation when I send the file.
>
> . . . .
>
> Mr. Schlimgen: . . . Judge, do you want in the letter a legal argument as to what's available to you or not?
>
> The Court: If you'd like. You're the one that's making the presentation and if you think it would be helpful it certainly won't offend me.
>
> Mr. Schlimgen: Okay.
>
> The Court: And it's entirely possible that you point out something that I'm either unaware of or have forgotten in terms of things to consider. And I don't want to miss anything in this case so don't be bashful about pointing out whatever you think is appropriate.

[¶ 24.] Dr. Langenfeld had already examined Milk at the time of the hearing. This case does not involve a simple oversight, but an affirmative choice to proceed with the resentencing hearing without Dr. Langenfeld's testimony Milk now argues is

so essential. Based upon this record, the trial court's refusal to reopen the hearing did not work an injustice on Milk's case. We find no abuse of discretion, and therefore affirm.

[¶ 25.] MILLER, Chief Justice, and SABERS, AMUNDSON, and KONENKAMP, Justices, concur.