2002 SD 16

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Guy G. PUGH, Defendant and Appellant.**

No. 21642.

Supreme Court of South Dakota.

Argued Oct. 2, 2001.

Decided Jan. 30, 2002.

Mark Barnett, Attorney General, Patricia Archer, Pierre, for plaintiff and appellee.

Kevin S. Lewis, Pennington County Public Defender's Office, Rapid City, for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.]   This is a criminal appeal from a judgment of conviction for kidnapping and second-degree rape.  We affirm.

## Background

[¶ 2.]   M.H.L. arose shortly before 4:00 a.m. on Tuesday, December 14, 1999, to prepare for her morning paper route in Rapid City, South Dakota.[1]  After dressing warmly against the winter cold, she left her apartment at the Corral Motel, where she was residing with her mother and younger brother.  She tried unsuccessfully for about half an hour to start her station wagon.  Two men emerged from a nearby room in the motel where a party was still underway.  The men approached her and offered to help.  At their suggestion, she opened the hood, and they made some adjustments to the carburetor.  With still no success in starting the car, M.H.L. told the men that she would have to use her bicycle to pick up and deliver the papers.  She began to remove it from her car trunk.  One of the men, Robert Ralston, went back to the party, but the other, defendant Guy Gregory Pugh, remarking on the cold, offered to take her to pick up the newspapers at the Rapid City Journal.  M.H.L. gratefully accepted.  Pugh drove her to retrieve her papers, and she put them in the back seat.  To this point, all had been cordial.  Thereafter, the versions conflict markedly.

[¶ 3.]   According to M.H.L., Pugh offered to drive her around on her paper

---

1.  We use the rape victim's initials throughout this opinion to protect her privacy.  At the time of this incident, she was thirty.

route, but she declined and asked to be taken back to the motel to get her bicycle. Pugh drove in a different direction. He refused to let her out of the car despite her repeated requests. They drove around town for approximately an hour, stopping occasionally while they talked. Still promising to take her home, he stopped the car at one point, to get out and urinate. Eventually, they arrived at a parking lot on Dinosaur Hill, a sightseeing area overlooking the city. Under threat of harm, M.H.L. pulled down her pants about her ankles, Pugh took off his pants and shoes, climbed onto her, and sexually penetrated her. She protested, she struggled, she prayed. She even tried to open the door.

[¶ 4.] To thwart escape, Pugh held one of her arms painfully behind her back, placed his mouth over her nose to stifle her cries, and put a hard object against the side of her head, threatening to shoot her. Thereafter, she ceased struggling and protesting. Saying that he could not go back to prison, Pugh twice asked, "I have your consent for this, don't I?" M.H.L. responded yes, explaining later, "I just wanted to get out of that alive." Next, he performed cunnilingus on her, and then he returned to a second act of penile penetration. Pugh allowed her to put her clothes back on, and he put his on as well. Then, despite her requests to take her home, he insisted on cuddling with her. He fell asleep. After it became light outside, he finally drove her home.

[¶ 5.] By the time the two returned to the motel, M.H.L.'s supervisor from the newspaper, Jay Erickson, was there, concerned that the papers on her route had not yet been delivered. She got her newspaper bundles from the backseat, told Pugh goodbye, and went into her apartment. Visibly distraught, M.H.L. reported to her mother and Erickson what had hap-

pened to her. Pugh did not leave, but knocked on his friend's door. Erickson noted the license tag of the car Pugh had been driving. He also asked Pugh his name. Pugh responded with a lie, saying his name was "Mike." Then, with M.H.L.'s approval, her mother telephoned their minister, Pastor Bill Turley, and asked him to come to their residence. Soon after Turley arrived, he persuaded M.H.L. to report the incident to the police, and he drove her to the station. She gave a statement to officers Darrell Brumbaugh and Lisa Lee. Next, Pastor Turley took M.H.L. to the hospital. There, Nurse Karen Schussler gathered evidence, and Dr. Michael Matthews performed a rape examination.

[¶ 6.] By tracing the license tag number reported by Erickson, the police identified the car as belonging to Sheila Furbish, Pugh's fiancée. Acting on a tip from Furbish, Officer Cliff Peterson found her car in the parking lot at DD's Bar, found Pugh in the bar playing pool, and took him into custody. After questioning at the police station by Detective Steve Oberman, Pugh was placed under arrest. According to Pugh, the trip up Dinosaur Hill and the ensuing sexual acts were consensual, accomplished without force or threat of force, and were as much her idea as his. Nor, according to him, did he ever transport and confine M.H.L. against her will. No gun was ever found, and, indeed, M.H.L. never actually saw any gun.

[¶ 7.] In the jury trial, the State called as witnesses M.H.L., her mother, Dr. Matthews, Pastor Turley, Erickson, Officer Brumbaugh, Officer Peterson, Nurse Schussler, and Detective Oberman. Pugh testified on his own behalf and called Ralston as a witness. The jury found Pugh guilty of kidnapping and second degree rape. On the kidnapping conviction, he was sentenced to life imprisonment with-

out parole, and for the rape he received twenty-five years, the sentences to run concurrently.

[¶ 8.] On appeal, Pugh raises the following issues: (1) Whether the evidence was insufficient to sustain a conviction for kidnapping and second degree rape. (2) Whether the violations of a pretrial order that prohibited the state from mentioning that the victim was a virgin was prejudicial to defendant. (3) Whether the trial court erred in allowing M.H.L.'s mother, Pastor Turley, and Jan Erickson to testify about M.H.L.'s statements.[2] (4) Whether the trial court erred in denying defendant's requested specific intent instruction.[3] (5) Whether the life sentence is so severe, excessive, and manifestly disproportionate to the crime that it shocks the conscience and therefore violates Article VI § 23 of the South Dakota Constitution. (6) Whether the life sentence is grossly disproportionate to the crime and is hence a violation of the Eighth Amendment to the United States Constitution.

### A. Sufficiency of the Evidence

[¶ 9.] On insufficiency of evidence claims, we review the evidence in a light most favorable to the verdict. *State v. Karlen*, 1999 SD 12, ¶ 49, 589 N.W.2d 594, 605 (citations omitted). The question is whether the evidence is sufficient to sustain a finding of guilt beyond a reasonable doubt. *State v. Hart*, 1996 SD 17, ¶ 8, 544 N.W.2d 206, 208 (citations omitted). We will not usurp the jury's function in resolving conflicts in the evidence, weighing credibility, and sorting out the truth. *Id.*

[¶ 10.] Kidnapping occurs when

[a]ny·person ... shall seize, confine, inveigle, decoy, abduct or carry away any person and hold or detain such person ... [t]o facilitate the commission of any felony....

SDCL 22–19–1(2). Second-degree rape under the circumstances here is defined as

an act of sexual penetration accomplished with any person ... through the use of force, coercion or threats of immediate and great bodily harm against the victim ..., accompanied by apparent power of execution.

SDCL 22–22–1(2). Pugh points to inconsistencies in the evidence and to the fact that M.H.L. had no physical manifestations of trauma. Certainly, M.H.L. and Pugh gave conflicting accounts of what happened on Dinosaur Hill, but the jury chose to believe M.H.L. Reviewing the evidence in a light favorable to the verdict, we conclude that it supports a rational theory of guilt. Accordingly, Pugh's argument on this issue fails.

### B. Violation of Pretrial Order—Virginity of Victim

[¶ 11.] The trial court granted a defense motion *in limine* to prevent the State from introducing evidence that M.H.L. was a virgin. The court reasoned that an avowal of virginity, as circumstantial evidence of unwillingness to engage in sexual acts, impermissibly broaches character evidence prohibited by SDCL § 19–12–4 (Rule 404(a)), which provides:

Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted

---

2. This issue lacks sufficient merit for discussion. The trial court properly allowed this testimony under the excited-utterance exception to the hearsay rule.

3. "Rape .... is a general intent offense." *State v. Means*, 363 N.W.2d 565, 568 (S.D. 1985). Pugh was charged with rape. Therefore, the trial court acted properly in refusing to issue a specific-intent jury instruction.

in conformity therewith on a particular occasion. . . .

The court relied on *People v. Bone*, 230 Mich.App. 699, 584 N.W.2d 760 (1998). In that case, a Michigan appeals court ruled that introduction of evidence of the alleged victim's virginity as circumstantial proof of her current unwillingness to consent to a particular sexual act was so prejudicial that a new trial was necessary. *Id.* at 762.

[¶ 12.] However, numerous courts throughout the country have ruled otherwise, recognizing that evidence of a victim's prior virginity is relevant to, if not highly probative of, the issue of consent. *See, e.g., State v. Preston*, 121 N.H. 147; 427 A.2d 32 (1981) (rape shield law would not prevent admission of victim's prior virginity for purpose of proving lack of consent); *State v. Aveen*, 284 Minn. 194, 169 N.W.2d 749 (1969) (physician's testimony of victim's prior virginity was admissible and germane to element of consent); *People v. Harris*, 297 Ill.App.3d 1073, 232 Ill.Dec. 108, 697 N.E.2d 850 (1998) (evidence of victim's prior virginity did not constitute evidence of past sexual activity within scope of rape shield law where evidence was relevant to circumstances of the assault); *State v. Singleton*, 102 N.M. 66, 691 P.2d 67 (N.M.Ct.App.1984) (upholding admission of victim's statement that she pleaded with defendant not to rape her because she was still a virgin as relevant to show lack of consent); *Goodrich v. State*, 671 S.W.2d 920 (Tex.App.1984) (victim's testimony of prior virginity was relevant and admissible); *People v. Johnson*, 671 P.2d 1017 (Colo.Ct.App.1983) (prosecution's questions regarding victim's prior virginity not improper under state's rape shield statute). In this case, a thirty-year-old victim's prior virginity is at least probative of the improbability that, on the spur of the moment on a sub-zero morning, she abandoned her employment and consented to sexual intercourse in a car on Dinosaur Hill with an inebriated man she had only just met.

■ [¶ 13.] The trial court ruled that evidence of M.H.L.'s virginity is also inadmissible under SDCL § 23A–22–15 (the Rape Shield Law), which provides:

> In prosecutions for a sex offense under chapter 22–22, evidence of specific instances of a victim's prior sexual conduct shall not be admitted nor reference made thereto before the jury or jury panel, except as provided in this section. Whenever a party proposes to offer evidence concerning a victim's prior sexual conduct, the court shall first conduct a hearing in the absence of the jury and the public to consider and rule upon the relevancy and materiality of the evidence.

Chastity, as much as promiscuity, may characterize a person's sexual conduct, so that—other things being equal—evidence of either would be inadmissible. Other things are not equal, however. The purpose of the rape shield law is not to bar people from vaunting their chastity or testifying to their loss of virginity, but to protect victims from the humiliation of having their unrelated sexual conduct paraded before juries. *See State v. Woodfork*, 454 N.W.2d 332, 336 (S.D.1990); *Jeffries v. Nix*, 912 F.2d 982 (8thCir.1990); *State v. Sanchez–Lahora*, 261 Neb. 192, 622 N.W.2d 612 (2001); *State v. Babbs*, 334 Ark. 105, 971 S.W.2d 774 (1998); *State v. Lampley*, 859 S.W.2d 909 (Mo.Ct.App. 1993). Accordingly, this protection should be subject to voluntary waiver by a victim in order to prove an element of the case.

■ [¶ 14.] Furthermore, the rape shield statute is not a total bar to admission of evidence of a victim's prior sexual conduct. As we said in *Woodfork*, "[e]vidence of a rape victim's prior sexual encounters may be admitted if the trial court

finds that it is relevant and material to a fact at issue in the case." 454 N.W.2d at 336. For example, evidence of a victim's prior virginity may be evidence of the victim's *physical state* before the assault. *See, e.g., Herndon v. State,* 232 Ga.App. 129, 499 S.E.2d 918 (1998) (holding physical injuries received during commission of rape, including condition of hymen, is admissible evidence); *People v. Stephens,* 18 Ill.App.3d 971, 310 N.E.2d 824 (1974) (holding medical testimony regarding victim's laceration of hymen was admissible evidence). Indeed, comparing the victim's physical state before and after an alleged assault might be relevant to a material issue in any rape case.

[¶ 15.] For these reasons, we hold that the trial court abused its discretion in granting the defense motion *in limine* to prevent the State from introducing evidence of M.H.L.'s prior virginity. Therefore, we need not reach the issue whether the violations of that order were prejudicial to defendant.[4]

## C. Life Sentence—Cruel and Unusual Punishment

[¶ 16.] In separate issues, Pugh challenges his sentence under the United States Constitution and the South Dakota Constitution. He contends that his life sentence both imposes a grossly disproportionate punishment and "shocks the conscience." The Eighth Amendment to our federal constitution forbids a sentence disproportionate to the crime. *Solem v. Helm,* 463 U.S. 277, 284, 103 S.Ct. 3001, 3006, 77 L.Ed.2d 637, 645 (1983). This principle is narrowly construed in noncapital cases. *Harmelin v. Michigan,* 501 U.S. 957, 997, 111 S.Ct. 2680, 2702–03, 115

L.Ed.2d 836, 866 (1991). We resort to intra-jurisdictional and inter-jurisdictional analysis "only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* at 1005, 111 S.Ct. at 2707, 115 L.Ed.2d at 871.

[¶ 17.] In *State v. Bonner,* we abandoned the "shock-the-conscience" test when conducting federal constitutional analysis under the Eighth Amendment. 1998 SD 30, ¶ 13, 577 N.W.2d 575, 579. Noting that "[t]he test was originally adopted for application only with our own state constitution, not the Eighth Amendment," we reserved the shock-the-conscience formulation for future consideration under our state constitution. *Id.* at n. 4. In *Bonner,* however, we found the sentence to be disproportionate under the Eighth Amendment, so we did not need to examine the sentence under Article VI § 23 of the South Dakota Constitution. Yet, we recognized our conscience "test to be roughly consistent with the gross disproportionality analysis used by the United States Supreme Court." *Bonner,* 1998 SD 30, ¶ 13, 577 N.W.2d at 579.

[¶ 18.] Pugh argues that the question remains whether a sentence reviewed under our state constitution, even if not violating the gross proportionality test, may nevertheless shock the conscience of humankind and this Court and may, on that basis, be overturned. The ideal underlying both tests is the same: whatever act society may reckon as deserving criminal punishment, our notions of justice require different offenses to be treated differently and like offenses to be treated alike. Although it has its flaws, the gross dispro-

---

4. Despite the court's ruling that evidence of M.H.L.'s virginity would not be allowed, one unambiguous and one ambiguous reference occurred at trial. The first reference came

from M.H.L. and the other, from a detective; neither was responsive to the question asked. Upon defense objection, the court ruled that the jury should disregard each reference.

portionality test allows for some precision in comparing judicially imposed punishments and assessing legislatively imposed gradations. Adverting only to the conscience, to ours or to what we perceive to be the people's, approaches resorting merely to the subjective.

 [¶ 19.] We see nothing in our state constitutional prohibition against "cruel punishments" to suggest that a different standard should be applied. Today, therefore, we take this opportunity to declare that the foremost line of review under both our federal and state constitutions is the gross disproportionality test.

> [To] assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature and the sentencing court.

*Id.* at ¶ 17. As for proportionality in this sentence, Pugh's record shows a background of violence against women, escalating over time. His criminal history includes a 1988 aggravated kidnapping conviction in Texas, as well as arrests in South Dakota for simple assault (domestic violence), violation of a protection order, and possession of a firearm by a felon. Thus, the kidnapping and rape of M.H.L. were not isolated incidents, but only the latest in a series of acts, all indicating an unlikely prospect for rehabilitation. Pugh's lack of remorse for his crimes against M.H.L. bodes only worse for his chances of reform. The Legislature sanctioned life imprisonment for particularly egregious conduct such as kidnapping, and the trial court found that Pugh was incorrigibly dangerous to others and incapable of rehabilitation. As we have remarked, "successful challenges to the proportionality of particular sentences [will be] exceedingly rare," for

this Court gives great deference to sentencing decisions. *State v. Milk,* 2000 SD 28, ¶ 10, 607 N.W.2d 14, 18. In *Bonner,* we held that if a sentence fails "to suggest gross disproportionality, our review ends." *Bonner* at ¶ 17. We find no inference of gross disproportionality in this sentence.

[¶ 20.] Affirmed.

[¶ 21.] GILBERTSON, Chief Justice, and SABERS and AMUNDSON, Justices, and GORS, Acting Justice, concur.