2003 SD 85

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Manuel HATCHETT, Defendant and Appellant.**

No. 22683.

Supreme Court of South Dakota.

Considered on Briefs May 27, 2003.

Decided July 23, 2003.

Lawrence E. Long, Attorney General, Gary Campbell, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

John J. Simpson, Hamill, South Dakota, Attorney for defendant and appellant.

KONENKAMP, Justice.

[¶ 1.] After pleading guilty to fourth offense DUI, defendant was sentenced to the penitentiary for five years, and his driving privileges were revoked for an "indefinite period of time." He appeals his license revocation as being unlawful and his penitentiary sentence as being unconstitutional on grounds of "racial disparity." Because our statutes only authorize courts to revoke driving privileges for a definite period, the indefinite revocation was impermissible. We reverse the license revocation and remand for the court to revoke defendant's driving privileges for a specific period. As to his penitentiary sentence, other than referring to the recently released Braunstein–Feimer statistical report, defendant submitted no evidence to support his racial disparity claim. Because there is no evidence that the decisionmakers in this case acted with discriminatory purpose, we hold that this report alone is insufficient to prove that the sentence here was unconstitutional. We affirm the penitentiary sentence.

## Background

[¶ 2.] On August 11, 2002, at 2:08 a.m., South Dakota Highway Patrol Sergeant John Koenig encountered a speeding pickup truck on U.S. Highway 18, in Bennett County. His radar indicated that the truck was traveling at 81 m.p.h. The speed limit was 65 m.p.h. Sergeant Koenig pulled the truck over. As he approached the driver's side window, he saw several beer cans. He also noticed the odor of alcoholic beverages coming from the occupants. The driver, later identified as Manuel Warren Hatchett, had a flushed complexion and bloodshot eyes.

[¶ 3.] Sergeant Koenig informed Hatchett of the reason he had been stopped. In response, Hatchett mumbled something, stared forward, and stated that he had no driver's license. When Koenig reached inside and shut off the engine, Hatchett let the truck out of gear and it began to roll backwards. Koenig had to yell at him three times before he responded and stopped the vehicle. Hatchett moved slowly and his speech was slurred. Once the truck was halted, Koenig asked Hatchett to come back to his patrol car. The driver's door was ajar. Hatchett got out of the truck through the window with Koenig's help. On the way to Koenig's patrol car, Hatchett staggered and was unsteady.

[¶ 4.] In the patrol car, Hatchett first identified himself as Chris W. Hatchett. But the radio dispatcher could find no record of such person. Koenig soon learned Hatchett's actual identity. Hatchett told Koenig that he thought he was going 75 m.p.h. in a 75 m.p.h. zone. He failed the sobriety tests the sergeant administered inside the car and although he had initially agreed to perform additional physical tests outside, he declined, citing a bad leg. Koenig arrested Hatchett for driving under the influence of alcohol. When Koenig read the implied consent warning to Hatchett, he did not respond. He had fallen asleep. The sergeant was unable to wake him.

[¶ 5.] At some point, Koenig found rolling papers in Hatchett's pockets and later, when interviewing him, noticed a bulge in his right sock that turned out to be a bud of marijuana wrapped in a napkin. At the hospital in Martin, a sample of Hatchett's blood was drawn. Later analysis revealed that he had a blood alcohol content (BAC) of .30.

[¶ 6.] At the time of his arrest, Hatchett's license had been suspended and an active warrant had been issued for his failure to comply with the sentence from a prior DUI conviction in Minnehaha County. Hatchett had a lengthy criminal record including five DUIs (with a sixth at the

age of 17) and a conviction for involuntary manslaughter in federal court. The latter conviction arose from the death of his eighteen year-old niece who fell from the back of his truck while he was driving. Hatchett pleaded guilty to fourth offense DUI. Under a plea agreement, several related misdemeanor charges were dismissed. In the interim between his guilty plea and sentencing, the court granted Hatchett permission to enter an inpatient alcohol treatment center on November 12, 2002. Within one week, he was in trouble at the treatment center for testing positive for marijuana use. He was returned to custody on November 20, 2002.

[¶ 7.] The court pronounced sentence on December 16, 2002. Noting his prior DUI convictions, his extensive arrest record, his noncompliance with the sentence on his last DUI, and his inability to follow through in getting help for his problems, including his recent failure in treatment, the court concluded that probation was not feasible and that Hatchett needed the structure provided through incarceration. The court sentenced him to five years in the penitentiary with credit for previous time served, ordered him to pay costs and fees, and revoked his driving privileges "for an indefinite period of time." Hatchett appeals on the following issues: (1) "Did the sentence of the trial court exceed statutory limits?" (2) "Did the sentence of the court violate constitutional or procedural requirements? Should a racial disparity and proportionality hearing be held?"

## 1. Revocation of License for "Indefinite Period"

■ [¶ 8.] Hatchett contends that the trial court exceeded statutory limits in revoking his driving privileges "for an indefinite period of time."[1] SDCL 32–23–4.6 provides:

> If conviction for a violation of § 32–23–1 is for a fourth offense, or subsequent offenses thereafter, and the person has previously been convicted of a felony under § 32–23–4, the person is guilty of a Class 5 felony, **and the court, in pronouncing sentence, shall unconditionally revoke the defendant's driving privileges for such period of time as may be determined by the court, but in no event less than two years from the date sentence is imposed or two years from the date of discharge from incarceration, whichever is later.** If the person is convicted of driving without a license during that period, he shall be sentenced to the county jail for not less than twenty days, which sentence may not be suspended.

(Emphasis added.) The words "for such period of time as may be determined by the court" connote a definite period, not an indeterminate one.[2] SDCL 32–23–4.6. The Legislature made this explicit in SDCL 32–12–47.2: "Revocation is the termination of a person's driving privilege and withdrawal of that person's driver license, if any, for a specified time." By statute, then, the trial court had the authority to revoke Hatchett's driver's license for a specific length of time, not less than two

---

1. By revoking his driver's license for an indefinite time, perhaps the court sought to retain jurisdiction to later reduce the revocation in the event that Hatchett demonstrated that he was no longer a threat to society. However, SDCL 23A–31–1 provides that a court may reduce a sentence "within one year after the sentence is imposed."

2. In *State v. Groethe,* 439 N.W.2d 554 (S.D. 1989), we modified a sentence that revoked the defendant's driver's license for the remainder of his life, citing SDCL 23A–32–19 as authority to do so. *State v. Dufault,* 2001 SD 66, ¶ 10, 628 N.W.2d 755, 757–58.

years.[3] We reverse and remand for the court to order revocation of Hatchett's driving privileges for a definite period.

## 2. Unconstitutional Sentence

[¶ 9.] Both our federal and state constitutions guarantee equal protection of the laws and freedom from cruel and unusual punishment. U.S. Const. 8th and 14th Amendments; SD Const. VI, §§ 2, 23. Hatchett asserts that his five-year penitentiary sentence is unconstitutional because it is the product of "racial disparity in sentencing." He is an enrolled member of the Oglala Sioux Tribe. The Eighth Amendment to our federal constitution forbids a sentence disproportionate to the crime. *Solem v. Helm*, 463 U.S. 277, 284, 103 S.Ct. 3001, 3006, 77 L.Ed.2d 637, 645 (1983). A sentence disproportionate solely because of a person's race is constitutionally impermissible.

[¶ 10.] Hatchett's attorney asserts that his "belief is not the product of some frivolity, but is the result of a deep seated conviction that the justice system, and yes, the trial courts, engage in racial disparity in sentencing." In support, counsel cites the recently released study authored by Professors Richard Braunstein and Steve Feimer. *See* South Dakota Criminal Justice: A Study of Racial Disparities, 48 SDLawRev 171 (2003). Counsel seeks a remand "with instructions to hold a racial disparity and disproportionality study." He also asserts that often "defendants other than Native Americans have their DUI charges reduced and they do not reach the threshold of a third or fourth offense until they have been arrested many many times."

## A. Disproportionality

[¶ 11.] Before we will remand for a proportionality analysis, we must first determine whether the sentence appears grossly disproportionate. *State v. Pugh*, 2002 SD 16, ¶ 19, 640 N.W.2d 79, 85. Generally, a sentence within the statutory maximum will not be disturbed on appeal. *State v. Bonner*, 1998 SD 30, ¶ 10, 577 N.W.2d 575, 578. Although it has its flaws, the gross disproportionality test allows for some definitude in comparing judicially imposed punishments and assessing legislatively imposed gradations. *Pugh*, 2002 SD 16 at ¶ 18, 640 N.W.2d at 84–85. Under this test, we consider the conduct involved and any relevant past conduct, with utmost deference to the Legislature and the sentencing court. *Id.* at ¶ 19, 640 N.W.2d at 85.

[¶ 12.] When he was sentenced for this offense at the age of thirty-four, Hatchett had five DUI convictions as an adult. He was sentenced as a fourth offender. The maximum penalty for a fourth offense DUI is five years in the penitentiary and a $5,000 fine. SDCL 22–6–1(7). The court imposed the maximum penitentiary sentence. In addition to his prior DUIs, Hatchett also had a federal involuntary manslaughter conviction. He had twenty-two entries on his rap sheet, though many ended as dismissals. While his case was pending, the court permitted him to go into treatment. He lasted one week. A test of his blood showed that he had been using marijuana while in treatment. Hatchett's record clearly demonstrates a history of alcohol abuse and driv-

---

**3.** The State argues that revocation for an indefinite period is permissible, citing *Heninger v. Charnes*, 200 Colo. 194, 613 P.2d 884 (1980). There, a Colorado statute specifically stated that driving privileges were to be revoked for an "indefinite period of time" and reinstated only after certain conditions were fulfilled. Here, the language of the South Dakota statute controls. *South Dakota Wildlife Fed'n v. Water Mgmt. Bd.*, 382 N.W.2d 26, 33 (S.D.1986).

ing under the influence. The circuit court concluded that with Hatchett's background he was unlikely to reform in the near future and confinement in the penitentiary was necessary for the protection of the public. As we have remarked, "successful challenges to the proportionality of particular sentences [will be] exceedingly rare," for this Court gives great deference to sentencing decisions. *State v. Milk*, 2000 SD 28, ¶ 10, 607 N.W.2d 14, 18. In *Bonner*, we held that if a sentence fails "to suggest gross disproportionality, our review ends." *Bonner*, 1998 SD 30 at ¶ 17, 577 N.W.2d at 580.

[¶ 13.] Hatchett has not shown that his sentence is disproportionate. He cites no instances where others with similar records have received significantly different sentences.[4] Indeed, he never suggested to the circuit court that his sentence was disproportionate, that its imposition was racially motivated, or that it was somehow based on a biased perception of Native Americans. From our own examination of the record, we can find no inference of gross disproportionality in this sentence. Nor can we detect in the court's pronouncement of sentence any indication of racial bias.

**B. Denial of Equal Protection**

 [¶ 14.] Hatchett believes that non-Indian defendants commonly receive reduced charges before they are prosecuted finally for multiple offense DUIs. A defendant asserting an equal protection violation must prove that the State's actions had a discriminatory effect and were motivated by a discriminatory purpose. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272–74, 99 S.Ct. 2282, 2292–93, 60 L.Ed.2d 870 (1979). Even to obtain

discovery in support of a selective prosecution claim, criminal defendants must make a "credible showing" that "similarly situated individuals of a different race were not prosecuted," or, more particular to this case, not required to answer for multiple offense DUIs. *United States v. Armstrong*, 517 U.S. 456, 470, 116 S.Ct. 1480, 1489, 134 L.Ed.2d 687 (1996). Hatchett's only evidence is the Braunstein–Feimer report.

[¶ 15.] The United States Supreme Court has approved the use of statistics to show discrimination. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220 (1886); *Hunter v. Underwood*, 471 U.S. 222, 227, 105 S.Ct. 1916, 1919–20, 85 L.Ed.2d 222 (1985). Of course, "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856–57, 52 L.Ed.2d 396 (1977). And "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *United States v. Bass*, 536 U.S. 862, 864, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002). Presupposing for the purposes of this proceeding that the Braunstein–Feimer study establishes a credible showing of discriminatory effect, we must make a second inquiry. *See Schweiker v. Wilson*, 450 U.S. 221, 233, 101 S.Ct. 1074, 1082, 67 L.Ed.2d 186 (1981).

 [¶ 16.] In addition to proving discriminatory effect, Hatchett must also show discriminatory intent to establish a violation of the Equal Protection Clause. *Washington v. Davis*, 426 U.S. 229, 242, 96

---

4. Hatchett asks us to take judicial notice of the Federal Sentencing Guidelines. He submits no authority to support how these guidelines would apply, much less compare, to state sentences.

S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976). He must prove that the decisionmaker in his case "acted with discriminatory purpose." *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987). " 'Discriminatory purpose' ... implies more than ... intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of' ... its adverse effects upon an identifiable group.' " *Id.,* 481 U.S. at 298, 107 S.Ct. at 1770 (quoting *Pers. Adm'r of Massachusetts,* 442 U.S. at 279, 99 S.Ct. at 2296, 60 L.Ed.2d 870.

[¶ 17.] In *McCleskey,* the defendant relied on a statistical study showing that African American defendants have a greater likelihood of receiving the death penalty than white defendants. The Supreme Court ruled that to prevail, McCleskey needed to prove that the decisionmakers in *his* case acted with a discriminatory purpose. *Id.* at 292, 107 S.Ct. at 1767 (emphasis added). The Court disagreed with the contention that the statistical study alone constituted sufficient proof of purposeful discrimination in his case. *Id.* at 297, 107 S.Ct. at 1770.

[¶ 18.] To meet his burden, Hatchett must prove that he was prosecuted for fourth offense DUI because the State was motivated by a discriminatory intent. He relies solely on the Braunstein–Feimer study suggesting disparities in South Dakota's criminal justice system. He fails to show how this study indicates that the decisionmakers in his case acted with discriminatory purpose. *See id.* at 297, 107 S.Ct. at 1770.

[¶ 19.] In "rare cases" statistical patterns of discrimination have shown a constitutional violation. *Id.,* 481 U.S. at 294 n.12, 107 S.Ct. at 1768 n.12 (citing *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)). The

Supreme Court "has accepted statistics as proof of intent to discriminate in certain limited contexts." *Id.* at 293, 107 S.Ct. at 1767. Specifically, the "Court has accepted statistical disparities as proof of an equal protection violation in the selection of the jury venire in a particular district" and "has accepted statistics in the form of multiple-regression analysis to prove statutory violations under Title VII of the Civil Rights Act of 1964." *Id.* at 293–94, 107 S.Ct. at 1767–68. These situations are not before us. Hatchett submits only the statistics, with the request that his case be remanded for "a racial and proportionality study." In the absence of any evidence, much less proof, of discrimination in the record, this is insufficient.

> In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." ... Judicial deference to the decisions of these executive officers rests in part on an assessment of the relative competence of prosecutors and courts.... It also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function.

*Armstrong,* 517 U.S. at 464–65, 116 S.Ct. 1480, 134 L.Ed.2d 687 (citations omitted). Hatchett has not met his burden of showing that the State purposely discriminated against him.

**Conclusion**

[¶ 20.] Sentencing decisions based on race are repugnant to our "color-blind" Constitution. *Plessy v. Ferguson,* 163 U.S. 537, 559 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting). We take seriously any accusation that South Dakota trial courts "engage in racial disparity in sentencing." As this State's Court of last resort, we will not tolerate racial disparity in our judicial sys-

tem. Yet, general studies suggesting that members of one race may have received higher penalties do not, alone, establish cruel and unusual punishment or show a violation of equal protection in an individual case, unless there is evidence that the decisionmakers in that case acted with discriminatory purpose. Absent any evidence particular to this case, the Braunstein–Feimer report alone does not prove that Hatchett received discriminatory treatment.

[¶ 21.] Affirmed in part, reversed in part, and remanded.

[¶ 22.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.