#23463-a-DG

**2006 SD 75**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

  v.

CAMERON GENE BLAIR,                          Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JOSEPH NEILES
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

GARY CAMPBELL
JOHN M. STROHMAN
Assistant Attorneys General
Pierre, South Dakota                          Attorneys for plaintiff
                                              and appellee.


TIMOTHY J. RENSCH
Rensch Law Office
Rapid City, South Dakota                          Attorney for defendant
                                              and appellant.

\* \* \* \*

ARGUED OCTOBER 5, 2005
REASSIGNED FEBRUARY 6, 2006

OPINION FILED **8/16/06**

#23463

GILBERTSON, Chief Justice (on reassignment).

[¶1.] For the second time, Cameron Blair appeals his sentences for five counts of filming a minor in a prohibited sexual act as grossly disproportionate. We affirm.

## FACTS AND PROCEDURE

[¶2.] Cameron Blair (Blair) shared custody of his daughter, who was fourteen years old at the time of the events leading up to Blair's arrest, with his ex-wife. Blair had a long history of allowing his daughter to have her girlfriends spend the night at his home. At these slumber parties, the girls typically used Blair's hot tub after which Blair would insist that the girls shower. Blair also required his daughter to shower several times a day while at his home.

[¶3.] On June 13, 2002, Blair's daughter invited four girls to a sleepover at Blair's home. At the time of the sleepover, the girls ranged in age from fourteen to fifteen years old. The girls used the hot tub and were required by Blair to shower afterward. Ultimately, the girls became suspicious that Blair was videotaping them while they were in the bathroom.[1]

[¶4.] Sometime around midnight, Blair took two of the girls, who were fifteen at the time, down to the basement and engaged them in conversation. Blair told the girls that he was a therapist and offered advice and information about life and boys. He eventually shifted the topic to the subject of sex and masturbation. He attempted to get the girls to tell him how often and how they masturbated, and

---

1. The girls became suspicious that Blair was filming them in the bathroom after he placed a video camera on a shelf in the bathroom and told the girls not to touch it as it was recharging.

shared with them that he had masturbated that morning while watching a videotape of himself and a former spouse having sex. He also shared detailed stories about his past sexual experiences. Blair told the girls he liked women with big nipples, and then repeatedly asked them to show him their breasts. At some point in the conversation, Blair pulled his gym shorts flat against his body to reveal the outline of his penis and testicles, which he then pointed out and named for the "educational benefit" of the two girls. While he was explaining and pointing out his male anatomy, his penis extended beyond the hem of his shorts and was visible for a minute or more.[2] During the course of the evening, Blair also rubbed one of the girls on her upper thigh, explaining the "proper" way to excite a man. This "therapy session" lasted for several hours. Several times during the conversation, Blair's daughter attempted to come downstairs to ask what the group was discussing. However, Blair repeatedly sent her back upstairs and directed her to stop interrupting his conversation.

[¶5.] Finally, at approximately 6 a.m. the "therapy session" ended when the two girls decided to feign sleep in order to end the conversation. Blair offered to tuck the two girls into bed. He sat down between the two girls on the bed and rubbed their heads "to help them fall asleep faster." As Blair got up from the bed, he grabbed both girls' buttocks over the covers and left the room. The girls then ran to the bathroom and locked themselves inside to change clothes. They left Blair's home and returned to the home of one of the girls, where they reported the events to

---

2. Blair denies he exposed himself to the two girls during the conversation. However, both girls described the event at two different interviews and maintained that Blair exposed his penis during the conversation.

the girl's mother. When Blair's ex-wife learned what had occurred at the slumber party, she called the police and an investigation was initiated.

[¶6.] The investigation originally centered on Blair's conduct on the night of the slumber party. However, a search warrant was issued after Blair's daughter told police she had seen a videotape of a seven- or eight-year-old male foster child placed in Blair's care, in which the child was filmed in the nude. The search of Blair's home revealed a VHS format videotape containing fifty separate instances in which girls as young as age eleven were surreptitiously videotaped by Blair while in the bathroom. The police also discovered that a crack in the wall between the bathroom and the laundry room recently had been patched. The location of the crack was such that it provided visual access to the bathroom and was of sufficient size to permit videotaping.

[¶7.] A Minnehaha County deputy state's attorney showed Blair's daughter and one of her friends still photographs made from the videotape as part of the investigation into Blair's conduct. His daughter identified herself and four of her friends from the still photographs and from the appearance of the victims, clothing, hairstyles and voices captured on the videotape. She was also able to determine that the videotaping occurred at Blair's current and former homes, and the approximate dates when the videotaped images were captured. The other girl also was able to identify herself, other friends, locations, and approximate dates from the still photographs. From these interviews, the deputy state's attorney was able to determine that the girls in the videotape ranged in age from eleven to fourteen, and that over the course of eighteen months, Blair surreptitiously videotaped them.

#23463

[¶8.] The videotape seized by police contained over ninety-one minutes of images. The first few seconds are a recording of a small portion of a newscast. The tape then transitions to images shot by Blair. Of the ninety-one minutes of videotape shot by Blair, twenty-four minutes were shot while the camera was in a stationary location. Of those twenty-four minutes, eleven minutes are of Blair and an adult woman engaged in sexual activity. The other thirteen minutes are of the children showering, using the toilet, and performing other common everyday functions. However, the balance of the videotape is of an entirely different character.

[¶9.] Approximately sixty minutes of the videotape were shot by Blair while manipulating the camera in order to obtain specific footage, angles and content. As the circuit court noted, the content Blair was after included close-up and zoomed in shots of the breasts, nipples, pubic area, and genitalia of Blair's daughter and four of her friends while they were engaging in common everyday functions in the bathroom. By zooming in, manipulating the camera angle around clothing and towels, and at times turning the camera upside down to shoot up between a girl's legs, Blair sought to obtain as much footage as possible of these specific body parts of the five girls. The videotape also included footage of one of the young girls masturbating with a hairbrush.

[¶10.] In addition to the footage of the naked bodies of girls ranging in age from eleven to fourteen, a few images were of one or two adult women. There was also a clip of approximately fifty-five seconds in length in which a young pre-

-4-

adolescent boy is shown naked as he exits the shower and towels off. The camera was manipulated by Blair and zoomed in on the young boy's genitals.

[¶11.]     Based on the images on the edited videotape, it is obvious that it does not play in the same order in which the images were shot. Rather, each of the fifty instances of videotaping were filmed at a different time across an eighteen month time frame and in two different locations. The footage was then edited and spliced together to produce the VHS videotape containing the ninety-one minutes of images.[3] Law enforcement was able to determine that the newer images were filmed in Blair's present home through the crack in the wall, while older images were filmed in his previous home through a grate between the bathroom and Blair's bedroom.

[¶12.]     The police also discovered a computer disk with two images of child pornography. One image was of two small girls approximately five to six years of age, in which one of the girls was touching the other in a sexual manner. The second image appeared to be of a five-year-old girl masturbating the erect penis of an adult male.[4]

---

3.     The VHS videotape discovered is highly edited. The images suggest that the original footage was shot on other tapes and then edited onto the videotape discovered in Blair's home. An eight millimeter video camera was discovered in Blair's home during the search and is believed to be the camera utilized by Blair to shoot the original footage. However, the original tapes shot by Blair were never recovered by law enforcement.

4.     Blair disavowed any knowledge of these images, stating that he had purchased a box of computer disks at a garage sale and was not aware of the images on one of the disks. He further stated that he subsequently discovered the disks were insufficient for his data storage needs and he never used any of the disks.

[¶13.] Based on the images discovered on the videotape, Blair was charged with five counts of filming a minor in a prohibited sexual act in violation of SDCL 22-22-23. Prior to its repeal, SDCL 22-22-23 provided in relevant part:

> Any person who causes or knowingly permits the photographing or filming of a minor under the age of sixteen years to engage in a prohibited sexual act or in the simulation of such act is guilty of a Class 4 felony. Any person who photographs or films a minor under the age of sixteen years engaging in a prohibited sexual act or in the simulation of such an act is guilty of a Class 4 felony.

The definition of a prohibited sexual act included "nudity if such sexual act is depicted for the purpose of sexual stimulation or gratification of any person who might view such depiction." SDCL 22-22-22 (repealed by SD SL 2002, ch 109, § 1). As a Class 4 felony, a conviction under SDCL 22-22-23 was punishable by up to ten years in the state penitentiary. SDCL 22-6-1.

[¶14.] A separate criminal file was opened for the child pornography images. Blair was then charged with one count of possession of child pornography in violation of SDCL 22-22-23.1.[5] Blair pleaded not guilty to all the charges in circuit court. He later changed his plea to guilty to the five charges of filming a minor in a prohibited sexual act and one count of possession of child pornography. In

---

5. Prior to its repeal, SDCL 22-22-23.1 provided:
   Any person who knowingly possesses any book, magazine, pamphlet, slide, photograph, or film depicting a minor under the age of eighteen years engaging in a prohibited sexual act or in the simulation of such act or whose knowing possession encourages, aids, abets, or entices any person to commit a "prohibited sexual act" is guilty of a Class 6 felony.

   (repealed by SD SL 2002, ch 109, § 1). As a Class 6 felony, a conviction could result in a maximum sentence of two years in the state penitentiary. SDCL 22-6-1.

exchange, charges for the other forty-five images of a minor photographed in a prohibited sexual act and one image of child pornography were not brought.

[¶15.]	At a sentencing hearing conducted on December 4, 2002, one of the victims attempted to testify but was unable to do so due to emotion. Instead, her mother read her statement into the record. The mother of another one of the victims also read her daughter's statement into the record. In addition, Blair's daughter and first ex-wife sent letters to the judge but asked that they not be read in open court due to the extensive amount of publicity the case had received in the local media. The circuit court also considered a pre-sentence investigation report conducted by a court services officer, treatment notes and a sexual offender evaluation conducted by Sister Mary Carole Curran, Ph.D., and letters of support from Blair's family.

[¶16.]	The circuit court imposed the maximum ten-year sentence on each of the five counts of filming a minor in a prohibited sexual act to be served consecutively, for a total of fifty years in the penitentiary. No jail time was imposed for the possession of child pornography charge, but Blair was required to register as a sex offender under the conditions of the plea agreement. Blair appealed the sentence to this Court, arguing the sentence was grossly disproportionate. We affirmed the circuit court's sentence for the child pornography count, but reversed and remanded Blair's original sentence of ten years for each of the five counts of filming a minor in a prohibited sexual act. We specifically ordered the circuit court to examine Blair's rehabilitation prospects, and then resentence Blair taking into account the factors set forth in *State v. Hinger*, 1999 SD 91, 600 NW2d 542, and

*State v. Bonner*, 1998 SD 30, 577 NW2d 575. However, at that point in time, the appellate record lacked a copy of the videotape, the pre-sentence investigation report, police reports and Curran's treatment notes and sex offender evaluation.

[¶17.] As ordered by this Court, the circuit court engaged in a disproportionality analysis using the *Hinger/Bonner* factors. The circuit court found that Blair's conduct, criminal background, and lack of remorse supported his original sentences, and that the sentences were not grossly disproportionate. Despite its finding that the sentences were not grossly disproportionate, the circuit court, for the sake of judicial economy, conducted an intra-jurisdictional review of similar offenses based on the evidence introduced by defense counsel. A second sentencing hearing was then scheduled. Defense counsel produced certified copies of a proportionality report compiled by the Unified Judicial System listing all convictions for violations of SDCL 22-22-23. Defense counsel submitted a brief arguing Blair's sentence was disproportionate to his crime when compared to ten other individuals convicted of the same or similar crimes. The State did not submit a brief.

[¶18.] The circuit court analyzed all ten cases provided by defense counsel in its written opinion. The circuit court found that only the case of *State v. Spack* was similar to the facts of Blair's case, but also acknowledged that the cases had major

differences.[6]  The circuit court also reviewed Blair's level of remorse, comparing it

to that of the defendant in *State v. Stahl*, 2000 SD 154, 619 NW2d 870.[7]

[¶19.]          At Blair's resentencing, the circuit court again imposed ten years in

the penitentiary on each of the five convictions to be served consecutively, for a total

of fifty years.  However, the circuit court suspended two years on each conviction

with conditions, resulting in a sentence of forty years.  Blair raises one issue on

---

6.      Pennington County file number 01-832.  In *State v. Spack*, the defendant was charged with twenty counts of third degree rape of his fiancée's thirteen-year-old daughter, nine counts of possession of child pornography under SDCL 22-22-23.1, and nine counts of filming a minor in a prohibited sexual act under 22-22-23.  The defendant in that case engaged in sexual relations with the victim over a three-year period of time.  The photographing charges were based on the fact that the defendant photographed the girl while she performing fellatio on him.  Under a plea agreement, the defendant was sentenced on two counts of rape in the third degree to two terms of twenty years to be served consecutively.  In addition, the defendant was sentenced on two counts of filming a minor in a prohibited sexual act to two ten-year terms to be served concurrently with his rape sentences.

7.      In *Stahl*, the defendant was convicted of possession of marijuana, distribution of marijuana and distribution of marijuana in drug-free zone, a total of four felony counts, and received a twenty-four year prison sentence.  2000 SD 154, ¶3, 619 NW2d at 871.

> In his pre-sentence report statement, Stahl proclaimed his only crime was in caring too much and helping his fellow man and that he was innocent of the charges.  He claimed he did not possess or distribute marijuana at any time, yet alone in a drug-free zone, despite the taped recordings documenting both drug sales and the jury's determination that he did commit these crimes.

*Id*. ¶7, 619 NW2d at 872.  The circuit court viewed this as a lack of remorse and considered it heavily when it imposed the sentence.  On appeal the sentence was affirmed, and this Court held that a defendant's lack of remorse is appropriately considered by a sentencing court.  *Id*. (citing Ganrude v. Weber, 2000 SD 96, ¶12, 614 NW2d 807, 810; State v. Chase in Winter, 534 NW2d 350, 355 (SD 1995)).

appeal: Whether Blair's forty-year sentence is grossly disproportionate to his crimes and therefore constitutes cruel and unusual punishment.

## STANDARD OF REVIEW

[¶20.]    Generally, a sentence within the statutory maximum is reviewed by this Court under the abuse of discretion standard. State v. McKinney, 2005 SD 73, ¶10, 699 NW2d 471, 476 (*McKinney I*) (citing State v. Goodroad, 1997 SD 46, ¶40, 563 NW2d 126, 135 (citing State v. Anderson, 1996 SD 46, ¶30, 546 NW2d 395, 402)). "We give 'great deference to sentencing decisions made by trial courts.'" State v. Garber, 2004 SD 2, ¶13, 674 NW2d 320, 323 (quoting State v. Milk, 2000 SD 28, ¶10, 607 NW2d 14, 17 (citing State v. Gehrke, 491 NW2d 421, 422 (SD 1992))). "Absent specific authority, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence[.]" *Id.* (quoting *Milk*, 2000 SD 28, ¶10, 607 NW2d at 17 (quoting *Gehrke*, 491 NW2d at 423)). Thus, this Court will rarely overturn a sentence within the statutory maximum on appeal. State v. Herrmann, 2004 SD 53, ¶26, 679 NW2d 503, 511 (citing *Garber*, 2004 SD 2, ¶28, 674 NW2d at 327).

[¶21.]    However, when a defendant challenges a sentence on Eighth Amendment grounds, our review is conducted using the standards set out in *State v. Bonner,* 1998 SD 30, 577 NW2d 575. State v. Piper, 2006 SD 1, ¶72, 709 NW2d 783, 810-11. We employ the following well-established principles when reviewing the proportionality of a given sentence:

> To assess a challenge to proportionality we first determine whether the sentence appears grossly disproportionate. To accomplish this, we consider the conduct involved, and any relevant past conduct, with utmost deference to the Legislature

> and the sentencing court. If these circumstances fail to suggest gross disproportionality, our review ends.

*Id.* ¶72 (quoting *Bonner*, 1998 SD 30, ¶17, 577 NW2d at 580 (citing Harmelin v. Michigan, 501 US 957, 1000, 111 SCt 2680, 2704, 115 LEd2d 836 (1991))). We also compare "the sentence with the criminal acts defendant committed and the consequences of those acts upon the victims and society." *Bonner*, 1998 SD 30, ¶22, 577 NW2d at 581 (citing *Harmelin,* 501 US at 1000, 111 SCt at 2704, 115 LEd2d 836 (quoting Rummel v. Estelle, 445 US 263, 274-75, 100 SCt 1133, 1139, 63 LEd2d 382 (1980))). Only when the sentence appears grossly disproportionate will this Court conduct an intra and inter-jurisdictional analysis. *Bonner*, 1998 SD 30, ¶17, 577 NW2d at 580.

[¶22.]     On review, we also must adhere to the well-settled principle that this Court does not "resolve conflicts in evidence, pass on credibility of the evidence, or weigh the evidence[.]" *Piper*, 2006 SD 1, ¶84, 709 NW2d at 815 (citing State v. Romero, 269 NW2d 791 (SD 1978)). Not having had the benefit of witnesses appearing before us, we must defer to the circuit court's assessment on the credibility of witnesses. *Id.* (citing State v. Burtzlaff, 493 NW2d 1, 4-5 (SD 1992)).

## ANALYSIS AND DECISION

[¶23.]     The United States Supreme Court has recognized the unique and compelling interest the state has in "safeguarding the physical and psychological well-being of a minor." Osborne v. Ohio, 495 US 103, 109, 110 SCt 1691, 1696, 109 LEd2d 98 (1990) (quoting New York v. Ferber, 458 US 747, 756-758, 102 SCt 3348, 3354-3355, 73 LEd2d 1113 (1982)). That Court has also recognized that virtually all states and the Federal government have passed legislation prohibiting the

production of child pornography. *Ferber*, 458 US at 758, 102 SCt at 3355, 73 LEd2d 113. This is because "the use of children as subjects of pornographic materials is harmful to the physiological, emotional and mental health of the child." *Id*.

[¶24.] This Court has previously noted in *Bonner*, "[c]rimes against children, especially sex offenses, have increased nationwide by epidemic proportions."[8] 1998 SD 30, ¶28, 577 NW2d at 583. Because our state laws are clear that no child should ever be used for sexual gratification,[9] our Legislature sought to impose a significant penalty upon those who use children in the production of child pornography, or who distribute or possess child pornography. State v. McKinney, 2005 SD 74, ¶27, 699 NW2d 460, 468 (*McKinney II*). As part of the statutory scheme designed to protect children from those who seek to manufacture or produce child pornography, the

---

8. While the crime in question in *Bonner*, 1998 SD 30, ¶28, 577 NW2d at 583, was statutory rape, circuit court dockets in South Dakota do not lack for child pornography cases and other sexual crimes perpetrated against children as evidenced by this Court's recent case load. *See* State v. Helland, 2005 SD 121, 707 NW2d 262 (intermediate appeal of charges under SDCL 22-22-24); *McKinney II*, 2005 SD 74, 699 NW2d 460 (prosecuted under SDCL 22-22-24); State v. Martin, 2003 SD 153, 674 NW2d 291 (prosecuted under SDCL 22-22-24); and State v. Christiansen, 2003 SD 64, 663 NW2d 691 (prosecuted under SDCL 22-22-23.1 (repealed by SL 2002, ch 109, § 3)).

9. *See* SDCL 22-22-1(1) (defining the sexual penetration of a victim less than thirteen years of age as rape); SDCL 22-22-1.2 (imposing minimum sentences for rape or sexual contact with a child); SDCL 22-22-7 (defining when sexual contact with a child under sixteen is a felony or a misdemeanor); SDCL 22-22-7.3 (defining sexual contact with a child under sixteen by another person younger than sixteen as a misdemeanor); SDCL 22-22-7.5 (defining safety zone for child victims of sex crimes); SDCL 22-24A-1 (making the sale of child pornography a felony); SDCL 22-24A-3 (defining the possession, manufacture or distribution of child pornography as a felony); SDCL 22-22-24.3 (criminalizing and defining sexual exploitation of a minor as a felony); SDCL 22-24A-5 (criminalizing the solicitation of a minor for purposes of engaging in a prohibited sexual act).

Legislature codified the photographing or filming of child in a prohibited sexual act as a Class 4 felony.[10] SDCL 22-22-23 (repealed by SL 2002, ch 109 § 2). As such, up to a maximum of ten years imprisonment in the state penitentiary may be imposed for the conviction on one count, in addition to a fine of ten thousand dollars per conviction. SDCL 22-6-1(7).

[¶25.] When the Legislature defined what constituted a prohibited sexual act under SDCL 22-22-22, it did not distinguish between or create degrees for the prohibited sexual acts. Instead, the statute provided:

> Prohibited sexual act, as used in §§ 22-22-23, 22-22-23.1, and 22-22-24 means, sexual intercourse, anal intercourse, masturbation, bestiality, sadism, masochism, fellatio, cunnilingus, or incest and any other sexual activity including nudity if such sexual activity is depicted for the purpose of sexual stimulation or gratification of any person who might view such depiction. Encouraging, aiding, abetting, or enticing any person to commit any such prohibited sexual act as provided in this section is a prohibited sexual act.

_____

10. We recognize that the statutory scheme was significantly altered in 2002 when SDCL 22-22-22 was repealed. However, the language of SDCL 22-24A-2 would still encompass the conduct for which Blair was convicted:

> "Prohibited sexual act," actual or simulated sexual intercourse, sadism, masochism, sexual bestiality, incest, masturbation, or sadomasochistic abuse; actual or simulated exhibition of the genitals, the pubic or rectal area, or the bare feminine breasts, in a lewd or lascivious manner; actual physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person is a female, breast with the intent to arouse or gratify the sexual desire of either party; *defecation or urination for the purpose of creating sexual excitement in the viewer*; or any act or conduct which constitutes sexual battery or simulates that sexual battery is being or will be committed. The term includes encouraging, aiding, abetting or enticing any person to commit any such acts as provided in this subdivision. The term does not include a mother's breast-feeding of her baby[.] (emphasis added).

SDCL 22-22-22 (repealed by SL 2002, ch 109 § 1).  The Legislature understood that a circuit court would have the discretion to impose a sentence within the zero to ten year range without regard to which of the prohibited sexual acts was depicted in a particular film or photograph upon which a conviction under SDCL 22-22-23 was based.  That is because the code provision did not distinguish between the different types of sexual activity, or define depictions of some activities as more egregious than the depiction of other prohibited sexual acts.

[¶26.]		However, it is well settled that sentencing discretion must be exercised with the understanding that "the Legislature in establishing a punishment range of zero to [ten] years for [photographing a child in a prohibited sexual act,] intended the more serious commissions of this crime to deserve sentences at the harsher end of the spectrum."  *Bonner*, 1998 SD 30, ¶25, 577 NW2d at 582.  Courts must "reserve the most severe sanctions for the most serious combinations of the offense and the background of the offender."  *Id*. (quoting People v. Milbourn, 461 NW2d 1, 17 (Mich 1990)).

[¶27.]		We have previously stated that in order to impose a sentence that is proportionate to the particulars of the offense and the offender, the circuit court must "acquire a thorough acquaintance with the character and history of the [person] before it."  *Bonner*, 1998 SD 30, ¶19, 577 NW2d at 580 (quoting State v. Chase in Winter, 534 NW2d 350, 354-55 (SD 1995)).  The *Hinger/Bonner* factors are the appropriate factors for the circuit court to consider when determining sentencing, which include the defendant's "general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime,

life, family, occupation, and previous criminal record." *Id*. (quoting *Chase in Winter*, 534 NW2d at 354-55). In addition, the trial court considers the rehabilitation prospects of the particular defendant. *Id*. (quoting Bult v. Leapley, 507 NW2d 325, 328 (SD 1993)). Finally, the impact of the crime on the victim or victims, including "evidence relating to personal characteristics of the victim and the emotional impact of the crime. . . ," also may be examined and considered by the trial court. State v. Rhines, 1996 SD 55, ¶130-134, 548 NW2d 415, 445-46 (quoting Payne v. Tennessee, 501 US 808, 811, 111 SCt 2597, 2601, 115 LEd2d 720 (1991)). When acquiring a thorough acquaintance of the man before it, the circuit court has wide discretion with respect to the type of information used as well as its source. *McKinney II*, 2005 SD 74, ¶17, 699 NW2d at 466 (quoting State v. Arabie, 2003 SD 57, ¶21, 663 NW2d 250, 257). "This consideration may include inquiry into 'uncharged conduct[.]'" *Id*. (citing United States v. Schaefer, 291 F3d 932, 944 (7thCir 2002)).

[¶28.]    Blair argues in his second appeal before this Court, that his reduced sentence of forty years on five counts of filming a minor in a prohibited sexual act is grossly disproportionate. He contends that a long penitentiary sentence was not appropriate or necessary given the facts of his case, and that the circuit court should have sentenced him at the lower end of the range. Blair offers as support for his contention the fact that he has no significant prior criminal history,[11] the sex offender evaluation rates him in the low to moderate range to re-offend, and that

---

11.    Blair's prior criminal record at the time of the sentencing hearing included misdemeanor convictions for disorderly conduct, three convictions for insufficient funds checks less than one hundred dollars, a conviction for driving while intoxicated, and a violation of a boating regulation.

the court services officer's pre-sentence investigation indicates Blair was remorseful. He also argues his prospects for rehabilitation were ignored by the circuit court. In addition, Blair argues his conduct was less severe in nature, and therefore deserving of punishment at the lower end of the range, because he did not direct the girls to engage in "intercourse, anal intercourse, bestiality, sadism, fellatio, etc.," nor was there any sexual contact between Blair and the victims. Finally, Blair argues that the injury inflicted upon the young girls occurred as a result of the state's attorney divulging the existence of the videotape and showing portions of it to the girls as part of his investigation, and that his lesser culpability in inflicting the injury should have been considered by the circuit court at sentencing.

[¶29.] It is clear from the record that Blair was not sentenced to forty years for filming a minor in a prohibited sexual act. Blair was sentenced to eight years on each of the five counts of photographing five different children in a prohibited sexual act, while no prison time was imposed for Blair's sixth felony count of possession of child pornography. The five eight-year sentences were then imposed consecutively for a total of forty years.

[¶30.] On review this Court must first determine whether a ten-year sentence, with two years suspended, is grossly disproportionate for each of the five felonies. Then, we must determine whether the imposition of five consecutive sentences is grossly disproportionate given the particulars of the offense and the offender. As we noted in *Hinger*, 1999 SD 91, ¶20, 600 NW2d at 548, "[t]he question becomes whether this 'most severe' sanction was reserved for 'the most serious

combination of the offense and the background of the offender.'" In doing so, we decline Blair's invitation to review the sentence under the premise that he was sentenced to forty years for filming a minor in a prohibited sexual act.

[¶31.]    The circuit court is given authority to impose consecutive sentences under SDCL 22-6-6.1, which provides:

> If a defendant has been convicted of two or more offenses, regardless of when the offenses were committed or when the judgment or sentence was entered, the judgment or sentence may be that the imprisonment on any of the offenses or convictions may run concurrently or consecutively at the discretion of the court.

SDCL 22-6-6.1 authorizes the circuit court to impose consecutive sentences at its discretion. State v. Moran, 2003 SD 14, ¶57, 657 NW2d 319, 332. In doing so, it must consider, as it must in any sentencing procedure, the *Hinger/Bonner* factors. *Supra* ¶27.

[¶32.]    We address each of the following factors separately on review: Blair's previous criminal record, his inclination to re-offend, his level of remorse, his rehabilitation prospects, the danger he presents to the community, and the effects of the crime on the victims.

*Previous Criminal Record*

[¶33.]    At the second sentencing hearing, the circuit court took into account all of the factors listed in *Hinger/Bonner*, noting that it considered Blair's lack of a significant prior criminal record to be irrelevant under the circumstances of this case. Our case law makes it clear that the existence or absence of prior criminal offenses is one of many factors to be considered by the trial court when imposing a sentence. *See Hinger*, 1999 SD 91, ¶21, 600 NW2d at 548. However, it is within the

circuit court's sentencing discretion to determine how much weight to give any of the relevant sentencing factors, including a defendant's prior criminal history. *See Piper*, 2006 SD 1, ¶84, 709 NW2d at 815 (holding on appeal this Court does not reweigh the evidence reviewed by the circuit court).

[¶34.] While the circuit court's choice of language seems to indicate it did not consider the lack of significant prior criminal history when it imposed Blair's sentence, a fair reading of the record indicates that the circuit court heavily discounted this factor in comparison to the other relevant factors it considered. The circuit court gave greater weight to other sentencing factors such as the number of charges that could have been filed against Blair, Blair's lack of remorse and candor, the escalation of Blair's conduct over the eighteen-month period in question, the age of the victims, and the effects of Blair's crimes on the five young girls victimized by his acts.

[¶35.] In the instant case, Blair could have been indicted and convicted of fifty or more violations of SDCL 22-22-23 based on the contents of the videotape, and two counts of possession of child pornography. Thus, he faced a potential of 500 or more years in prison if all charges had been brought and the maximum sentence imposed on each charge. However, under the terms of the plea bargain Blair pleaded guilty to only five counts of filming a minor in a prohibited act under SDCL 22-22-23 and one count of possession of child pornography. It was within the circuit court's broad discretion to take note of these additional uncharged counts when determining an appropriate sentence. *See McKinney II*, 2005 SD 74, ¶18, 699 NW2d at 466.

*Inclination to Re-offend*

[¶36.]     Blair argues that Curran's sex offender evaluation and the court services officer's pre-sentence investigation offer significant evidence that he was at low risk to re-offend, and therefore a lower sentence was required.  The relevant factors Blair argues the circuit court failed to consider were the low to moderate score he received on the sex offender evaluation; and the court services officer's assessment of Blair's candor, his assessment that Blair's crimes were on the lower end of the scale for sex offenses, and his sentencing recommendation.

[¶37.]     The psychological assessment conducted by Curran included two different instruments, the Minnesota Multi-Phasic Personality Inventory (MMPI-II)[12] and the Sexual Adjustment Inventory (SAI), which, according to her report, "is designed to identify sexually deviate and paraphiliac[13] behavior in people accused or convicted of sexual offense."

---

12.   In *Wiedmann v. Merillat Indust.*, we described the MMPI, or Minnesota Multi-Phasic Personality Inventory:

> The test is a standard objective psychological battery consisting of 550-566 true-false questions concerning behavior, feelings, social attitudes, and frank symptoms of psychopathology.  To each question, the subject must answer true, false or cannot say.  The subject's answer sheet is then scored by various keys that have been standardized on different diagnostic groups and personality types.  Sloane Dorland Annotated Medical-Legal Dictionary 717 (1987); Psychiatric Dictionary 640 (5th ed 1981).

2001 SD 23, ¶6 n2, 623 NW2d 43, 45 n2 (quoting Johnson v. Albertson's, 2000 SD 47, ¶14 n6, 610 NW2d 449, 452 n6).

13.   Paraphilia is defined as "the preference for or addiction to unusual sexual practices."  Webster's Third New International Dictionary 1638 (1976).

[¶38.] Curran reported that when responding to questions on the MMPI-II, "Blair attempted to place himself in an overly positive light by minimizing faults and denying psychological problems." Blair's MMPI-II profile was, with appropriate correction, within the normal range. However, Curran's report goes on to state that as a result of Blair's minimization of faults and denial of psychological problems, the assessments "may be an underestimate of Mr. Blair's psychological problems."

[¶39.] Curran's report also states that Blair was untruthful in his responses on the SAI. The directions to the assessment specifically state not to give false information as court records may be used for verification. Yet despite the warning in the instructions, Blair's responses were anything but true. Blair reported zero arrests, yet his court records indicated four arrests. Similarly, Blair answered zero for the number of lifetime misdemeanor convictions, zero for the number of times on probation, zero for the number of times in jail, zero for the number of sex related arrests and zero for alcohol related arrests. However, Blair's court records indicate each of these items should have been answered with a one.

[¶40.] Curran discussed these self-reported discrepancies in her report, and stated that "[t]here was insufficient time to rerun the data to determine the effect these inaccuracies might have had on the overall results. The results reported are those obtained assuming the data initially provided was truthful." Curran further stated "[t]hese results imply that Mr. Blair is not a rapist and that he has a low probability for sexual assault." Curran also stated that Blair scored in the medium risk range (forty to sixty-nine percentile) on the sexual adjustment scale, ranking in the fifty-sixth percentile. Curran indicated that "[s]ome caution and concern are

evident regarding this person's sexual adjustment responses." Finally, Curran reported that Blair's test results suggest that he is exhibiting psychological dysfunction of mild to moderate severity, but qualified this by noting that "it is impossible to know how much, if at all, his SAI scores would have been affected had the correct background information been provided."

[¶41.] Blair has attempted to characterize the report as strong positive mitigating evidence, as it contains an expert opinion that he is a low risk on the sexual assault scale, child molestation scale, and incest scale. While that may be true based on his responses as captured on the MMPI-II and SAI administered by Curran, it is obvious that Blair was less than truthful on each of these diagnostic tools, a fact not lost on the circuit court.

[¶42.] Next, Blair argues that the circuit court did not consider the court services officer's sentencing recommendation. He contends that the court services officer's recommendation of "a considerable amount of time with most of it suspended and with some specific recommendations to the parole board upon release" is entitled to greater weight than it was given by the circuit court. Blair argues that the court services officer had substantial experience in dealing with and interviewing defendants, and had no reason to "sugar coat" his opinions and reports.

[¶43.] While the court services officer did recommend a more lenient sentence, his final recommendation included a concession that he could not "be sure [Blair's sex crimes] would not have escalated into something more serious and perverted. . . ." The veteran officer also noted that while Blair was very "open and

talkative," whether or not he was "truthful is very hard to say as 'sex offenders' are the biggest 'cons' and are usually very convincing."

[¶44.] The circuit court is entitled to great discretion in weighing evidence. Based on the evidence before it, the circuit court found that Blair presented a greater risk to re-offend than either Curran or the court services officer concluded. Their conclusions were based on what the circuit court determined to be less than truthful responses from Blair given in an attempt to place himself in an overly positive light.

[¶45.] In its analysis of Blair's likelihood to re-offend, the circuit court heavily focused on the escalation of Blair's conduct the night of his daughter's sleepover. Blair attempted to get two of the girls to discuss masturbation with him, and to show him their breasts. Blair did so by engaging them in an all-night "therapy session" using skills developed as a youth advisor and counselor, and his position as an authority figure, as tools to manipulate these two fifteen-year-old girls under the guise of "educating" them for their own "benefit." *Compare* State v. Mitchell, 491 NW2d 438, 439-440 (SD 1992) (rejecting the defendant's proffered justification for repeatedly raping his stepdaughter that he was preparing her for dating); Mitchell v. Class, 524 NW2d 860, 861 (SD 1994) (affirming thirty-year sentence on six counts of rape, rejecting defendant's explanation that he was educating his stepdaughter on intercourse). Although no sexual contact occurred that evening, it was not for want of trying on Blair's part as he repeatedly asked the two girls to show him their breasts, rubbed one of the girls' on her upper thigh, grabbed both girls' buttocks, and exposed his penis to them. The circuit court did not err when it gave greater

weight to this evidence than the evidence generated from Blair's less than truthful responses to Curran and the court services officer.

*Remorse*

[¶46.]     Remorse is a factor appropriate for the circuit court to take into consideration when imposing a sentence. *Stahl*, 2000 SD 154, ¶7, 619 NW2d at 872 (citing Ganrude v. Weber, 2000 SD 96, ¶12, 614 NW2d 807, 810; *Chase in Winter*, 534 NW2d at 355). However, the circuit court is the final arbiter of the truthfulness of a witness. *Piper*, 2006 SD 1, ¶84, 709 NW2d at 815 (citing *Burtzlaff*, 493 NW2d at 4-5).

[¶47.]     The circuit court relied heavily on what it perceived to be Blair's lack of candor to the court, to Curran, and to the court services officer when it evaluated Blair's level of remorse. The circuit court noted Blair was less than truthful when he was assessed using the MMPI-II, and noted that his lack of candor was even more apparent on the SAI where Blair failed to self report his criminal history despite the warning that court records could be used to verify the truthfulness of his answers.

[¶48.]     Blair argues in his brief that he did not understand that the suspended imposition of sentence for his prior DUI arrest and probation would be a part of his record since no judgment of record was entered. However, Blair entered zero for *all* questions concerning past criminal conduct, arrests for sex related crimes, convictions, probation and times in prison. All this despite the fact that Blair was incarcerated at the time he took the assessment, after having been arrested for a sex related crime.

[¶49.]     The circuit court also gave great weight at the original sentencing hearing, and in its disproportionality analysis on remand, to the fact that Blair could offer no cogent explanation for his conduct or why he did not believe he would be discovered.  The only explanation offered by Blair to Curran and the court services officer for his conduct was "curiosity."

[¶50.]     What possible curiosity value could such videotape footage have for a twice-married-and-divorced forty-two-year-old father, who claimed to not have dated lately and who had problems relating to adult women?  The only possible "value" or "benefit" to Blair of the videotaped footage of his naked daughter and her friends at the ages of eleven through fourteen was for his own sexual gratification.  Blair's inability to accept his behavior for what it was also weighed heavily in the circuit court's determination of Blair's lack of candor and level of remorse.

[¶51.]     The fact that Blair was unable to articulate his reasons led the circuit court to believe that he was not truthful about his motivation for committing the crime, and not candid about his motivation for expressing remorse.  The circuit court determined that Blair's expressions of remorse were insincere and offered only in hopes of securing a lower sentence.  The circuit court did not abuse its discretion when it determined the evidence offered at the sentencing hearing did not support Blair's claimed sense of remorse.

*Rehabilitation Prospects*

[¶52.]     A defendant's denial may be considered by a sentencing court as an indicator of whether a defendant can be successfully rehabilitated.  *McKinney I*, 2005 SD 73, ¶12, 699 NW2d at 476-77.  That is because "[r]ehabilitation must begin

with the offender's acknowledgment of personal fault." State v. Clegg, 2001 SD 128, ¶6, 635 NW2d 578, 580. The inability or unwillingness to accept personal responsibility may be considered by a sentencing court as an indicator that a defendant's rehabilitation prospects are limited. *Id.*

[¶53.] In the instant case, Blair's inability to accept the seriousness of his conduct was a significant factor in the circuit court's determination of his rehabilitation prospects. The circuit court noted that without an admission by Blair as to the true nature of his conduct in filming and editing the video, rehabilitation efforts in the short term would prove futile.[14] Blair's insistence that he did not masturbate while watching the videotape was not believed by the circuit court, especially given that he had at first admitted that he had done so. The very nature of the videotape as it was edited renders it useless for any legitimate purpose, notwithstanding Blair's claim that it was done to appease his curiosity. Lacking the ability to admit his growing sexual attraction to young girls in their early teenage years and growing addiction to child pornography, an addiction some of Blair's relatives acknowledged in their letters of support to the court, the circuit court reasoned Blair would present a danger to the community that rehabilitative efforts

---

14. This Court in *McKinney I*, 2005 SD 73, ¶15, 699 NW2d at 477, upheld the trial court's finding that prospects for rehabilitation and sex offender treatment were poor due to the defendant's continued denial of misconduct, this despite a score in the low to moderate range to re-offend.

would not alleviate in the short term. Therefore, the circuit court elected to give more weight to the penological theory of incapacitation than rehabilitation.[15]

*Danger to the Community*

[¶54.]    The circuit court was greatly concerned with the escalation of Blair's conduct over time. The police reports contained in the pre-sentence investigation report indicated that Blair's first wife had discovered him peeking through a hole in the wall at two female guests staying at their home while they used the bathroom. After the failure of Blair's second marriage, it appears that his ability to maintain a relationship with an adult woman was further compromised as his self-esteem plummeted. Blair himself noted that he had not been dating much prior to his arrest. At some point in time, Blair appears to have abandoned attempts at relationships with adult women in favor of videotaping eleven- to fourteen-year-old girls.

[¶55.]    Curran's treatment notes indicate she discussed with Blair the growth and escalation of his behavior from videotaping to an attempt at outright physical contact with two of the girls at the sleepover. In response, Blair noted that three years prior to the arrest he would not have thought he would videotape people. Blair conceded that he had grown tired of watching videotaped images and had moved into personal contact and sexual talk with the two girls on the evening of the sleepover.

---

15.    The Eighth Amendment does not mandate the adoption of any one penological scheme. *Harmelin*, 501 US at 999, 111 SCt at 2704, 115 LEd2d 836. Penological schemes may be based on different theories, including retribution, deterrence, incapacitation or rehabilitation, as long as a sentence is not grossly disproportionate. *Id*.

[¶56.]    While Blair's progression from voyeur to child pornographer to attempted child molester may be characterized as slow, nevertheless it was obvious to the circuit court that Blair presented a very real danger to the community.[16] The circuit court concluded that the only reason Blair's conduct did not escalate to an actual attempt at sexual contact appeared to be his arrest.

[¶57.]    Blair's explanation for his conduct in his basement with these two young girls rings as hollow as his excuse that his motivation for creating the videotape was mere "curiosity." Blair offered that these two girls were not even friends of his daughters and that he had "basically found them and invited them to come over." He also told Curran that his conduct was the result of low self-esteem

---

16.    No empirical studies exist that quantify the number of child pornographers that escalate to predatory physical conduct. However, profiles of cases and Federal Bureau of Investigation "studies of sexual offenders indicate a correlation between the viewing and collection of child pornography materials and the subsequent commission of crimes." Michael K. Wegner, Teaching Old Dogs New Tricks: Why Traditional Free Speech Doctrine Supports Anti-Child-Pornography Regulations in Virtual Reality, 85 MinnLRev 2081, 2094, n69-71 (2001) (citing Child Pornography Prevention Act of 1995: Hearing Before the Senate Comm. on the Judiciary, 104th Cong 35 (1996) (statement of Professor Victor Cline) (testifying as "a clinical psychologist specializing in the treatment of sexual compulsions" and noting "that the overwhelming majority of the pedophiles he treats 'use child pornography and/or create it to stimulate and whet their sexual appetites which they masturbate to, then later use as a model for their own sexual acting-out with children'" and that "he had seen numerous cases where pedophiles used the pornographic material to seduce children into engaging in sexual acts")); United States Department of Justice Office of Juvenile and Delinquency Prevention, Use of Computers in the Sexual Exploitation of Children 3 (1999) ("describing use of child pornography as a characteristic of preferential sex offenders for law enforcement purposes"); National Center for Missing and Exploited Children, Child Molesters Who Abduct: Summary of the Case in Point Series (1995) ("detailing numerous cases of convicted child molesters and abductors who used various forms of child pornography as a means of stimulation of their own sexual desires before committing sexual crimes against children").

and a need to be admired. The circuit court did not accept these factors as plausible explanations, and again determined that Blair's inability to accept his conduct for what it was made him a danger to the community.

*Effects of the Crime on the Victims*

[¶58.] Blair's argument that his conduct was less severe in nature and therefore deserving of punishment at the lower end of the scale seems to suggest that the circuit court should have taken into account the degree of offensiveness demonstrated by Blair's taste in child pornography. Blair argues that his offense is deserving of a lesser punishment because no sex act other than masturbation was depicted, and because Blair did not direct the girls to engage in the conduct filmed.[17] However, the statute does not differentiate between the various prohibited sexual acts or rank the acts from severe to less severe and require that punishment be adjusted accordingly.

[¶59.] Blair does concede that the content of the videotape met the requirements of SDCL 22-22-23, the crime to which he pleaded guilty. However, despite this concession, Blair reasons his conduct is less deserving of punishment, as his crime only caused his victims humiliation and invaded their privacy. It is important to note that Blair was not charged with window peeking under SDCL 22-21-3, or with a misdemeanor under SDCL 22-21-4 for taking pictures of someone in

---

17. As noted by Justice Blackmun in his concurrence in *Ferber*, "a 12-year-old child photographed while masturbating surely suffers the same psychological harm whether the community labels the photograph 'edifying' or 'tasteless.' The audience's appreciation of the depiction is simply irrelevant to [the State's] asserted interest in protecting children from psychological, emotional, and mental harm." 458 US at 774-75, 102 SCt at 3364, 73 LEd2d 1113 (Blackmun, J., concurring).

the nude without their consent.[18]  These two crimes more aptly fit the description of a curious "peeping tom" that Blair attempts to give his conduct, and are considered invasion of privacy crimes.  Instead, Blair was charged with a sex crime under SDCL 22-22-23 for filming a minor in a prohibited sexual act.

[¶60.]       It is not just the humiliation and invasion of the girls' privacy that SDCL 22-22-23 was targeted at preventing as suggested by Blair.  The statute sought to protect children from those who photograph or film children engaged in prohibited sexual acts.  That is, the statute sought to protect children from those who create child pornography in either still picture or moving film format.  Whether the images of the children in question were limited to nudity, or extended to something as heinous as bestiality, the statute sought to protect children from predators who derive their sexual satisfaction from child pornography and those who seek to provide such predators with these images.

---

18.    SDCL 22-21-3 provides:  "No person may enter the private property of another and peek in the door or window of any inhabited building or structure located thereon, without having lawful purpose with the owner or occupant thereof.  A violation of this section is a Class 1 misdemeanor."

SDCL 22-21-4 provides:
No person may use a concealed camcorder, motion picture camera, or photographic camera of any type, to secretly videotape, film, photograph, or record by electronic means, any other person without clothing, or any other person under or through the clothing being worn by that other person, for the purpose of viewing the body of, or the undergarments worn by, that other person, without the consent or knowledge of that other person, with the intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of that person and invade the privacy of that other person, under circumstances in which the other person has a reasonable expectation of privacy.  A violation of this section is a Class 1 misdemeanor.

[¶61.]    The circuit court heavily focused its sentencing decision on the effects of Blair's crimes on the five young girls victimized.  The letters from several of the victims indicate the significant psychological harm incurred by the victims.  Each of the girls who wrote letters or statements to the circuit court focused on their respective disbelief that a parent could do such a thing to a child.  Blair's daughter wrote that she is unable to understand why her father would treat her in such a manner, and how she is unable to trust people as a consequence.  Other victims wrote similar statements, discussing how his acts were a violation of trust each of these girls had in Blair.  One of the victims wrote that she at times wondered if she could trust her own father not to do something similar to her.

[¶62.]    We do not accept Blair's characterization of the victims' injuries as humiliation and invasion of privacy caused by learning of the existence of the videotape, or seeing still photographs made from the videotape.  Nothing could be further from the true nature of the injuries inflicted upon these young girls, especially Blair's daughter.[19]  These young girls were used and exploited as sex objects by a forty-two year old man.  The State's disclosure of the existence of the videotape to the girls and showing some of them the still photos made from the videotape did not create the injury.  The injury was inflicted by Blair's conduct at the time he surreptitiously filmed the girls and then used those images for his own

---

19.    Blair continues to deny any sexual attraction to his daughter.  Even if the circuit court had accepted that statement as truth, it does not negate the fact that Blair appears to have used his daughter as a "stalking horse" in order to gain access to her friends.

sexual gratification. At that time, the children were victimized and the elements of the crime completed.

[¶63.] Blair was prosecuted for a sex crime, not for humiliating these children, invading their privacy, or causing them to exhibit trust issues. The circuit court understood the distinction and was clearly focused on the injury to the victims as encompassing sexual exploitation when it compared the psychological injuries of a rape victim to the psychological injuries incurred by these young girls.[20]

[¶64.] Furthermore, the circuit court was aware of the effects of Blair's crime on the community and on the victims as evidenced by its memorandum opinion issued after the first sentencing hearing and its opinion issued after conducting the gross disproportionality analysis on remand. "The legislature has determined that a sex crime against a child is a serious concern and one which should be punished severely." State v. Guthmiller, 2003 SD 83, ¶48, 667 NW2d 295, 311 (reaffirming that the utmost deference should be given to the Legislature and the sentencing

---

20. Blair's daughter wrote a letter to the circuit court prior to the sentencing hearing. It stated in part:
> Just being reminded of what my dad has done to me has some days made me question if there really was any reason to get out of bed in the morning. I just didn't want to live anymore. . . . The more I think about it the more I have realized I don't think of him as my dad because real Fathers don't hurt their children like this.

A letter to the court authored by one of the victims was read into the record at the sentencing hearing by her mother. It stated in part:
> I don't know where to start. I feel like my trust has been violated. I feel like I lost my identity. I [have] even come to think that I can't trust my own father. . . . It took everything to come here today to even face this man, to get up here and say what he did to me was wrong. Now I'm thinking about how he pictures me in his head. I was outraged, sad, frightened, all at the same time when I found out. I am scared to trust anyone. . . . I felt like dying when I found out.

court in cases involving sex crimes against a child, in the context of criminal pedophilia). Given the circuit court's understanding of the increasing trend of sex crimes against children, and the escalation of conduct often depicted in these types of cases, the circuit court did not err when it placed greater focus on the penological theories of deterrence and incapacitation rather than on rehabilitation.

[¶65.] In light of the egregious nature of the offense against at least five girls between the ages of eleven and fourteen, the repeated violations of SDCL 22-22-23 over an eighteen-month period, Blair's lack of remorse and candor about his own conduct, his attempts to shift the cause of the injury to the state's attorney, and the severe and long-lasting psychological injuries to his own child and the other child-victims, the sentences imposed were not grossly disproportionate to the crimes committed. Blair was sentenced to eight years for each of the five offenses charged. He was not sentenced to forty years for one felony. The fact that the sentences were imposed consecutively, while harsher than a concurrent sentence, does not make the sentences as a whole disproportionate.

[¶66.] The record clearly establishes that in the minds of each of these five girls the crimes were individual and specific to each of them and the emotional and psychological damages sustained by each was unique and individual. The circuit court was well within its discretion to hold Blair separately accountable for the crimes committed against each of the five victims of his crimes by imposing consecutive sentences. The circuit court justly concluded that concurrent sentencing would not accomplish justice for each of the five children victimized by

#23463

Blair. Separate crimes committed against separate victims justified separate, that is, consecutive sentencing.

[¶67.]    With the full record now before us we are able to discern the nature of Blair's character, his conduct, and its effect on the victims as determined by the circuit court. This is without a doubt the most serious violation of SDCL 22-22-23 in South Dakota, in that the videotape contained evidence of at least fifty separate violations against five different victims. The combination of the severity of the offense, the effects of the crime on the victims, and Blair's limited rehabilitation prospects justify a sentence at the harsher end of the spectrum. Based on the record as a whole, the five eight-year consecutive sentences, while harsh, do not appear grossly disproportionate and therefore do not violate the Eighth Amendment prohibition against cruel and unusual punishment. Therefore, we decline to review the intra-jurisdictional analysis offered by Blair on appeal.

[¶68.]    Affirmed.

[¶69.]    ZINTER, Justice, concurs.

[¶70.]    KONENKAMP, Justice, concurs in result.

[¶71.]    SABERS and MEIERHENRY, Justices, dissent.


KONENKAMP, Justice (concurring in result).

[¶72.]    The question we face today is whether a sentence of five eight-year consecutive prison terms is unconstitutionally excessive for a defendant convicted of five counts of photographing a minor in an obscene act. With noncapital sentences, the United States Supreme Court uses a "narrow proportionality principle" that forbids punishment "grossly disproportionate" to the crime. Ewing v. California,

-33-

538 US 11, 20, 23, 123 SCt 1179, 1186, 155 LEd2d 108 (2003) (O'Connor, J.,

concurring in the judgment) (quoting Harmelin v. Michigan, 501 US 957, 996-97,

111 SCt 2680, 2703, 115 LEd2d 836 (1991) (Kennedy, J., concurring in part and

concurring in the judgment)).[21]  We use the same analysis under the South Dakota

Constitution.  State v. Pugh, 2002 SD 16, ¶19, 640 NW2d 79, 84 (interpreting

Article VI section 23 of the South Dakota Constitution).

[¶73.]        In originally imposing sentence, the circuit court gave defendant ten

years for each of his five convictions, with each sentence to be served consecutively,

resulting in a total of fifty years in the penitentiary.  We remanded the case to the

circuit court for a reduction.  In reluctant compliance with our order, the judge

reduced each of the five sentences by suspending two years on the ten years

imposed for each conviction.  Now defendant faces a forty-year prison term.  He

contends that this new sentence is also grossly disproportionate.  In my view, the

correct method for performing a proportionality analysis of consecutive sentences is

not to examine them in aggregate, but to examine each one individually.

## I.

[¶74.]        In general, to ascertain whether a sentence is unconstitutionally

excessive, we must first decide whether there is a threshold showing of gross

disproportionality by comparing "the gravity of the offense [with] the harshness of

the penalty."  *Ewing,* 538 US at 28, 123 SCt 1179, 155 LEd2d 108; *accord Harmelin,*

---

21.    *Harmelin* and *Ewing* confirm that only in "exceedingly rare" cases will a
       sentence of a term of years violate the Eighth Amendment's prohibition on
       cruel and unusual punishment.  *Ewing,* 538 US at 22, 123 SCt at 1185, 155
       LEd2d 108 (citation omitted).

501 US at 1005, 111 SCt 2680, 115 LEd2d 836 (Kennedy, J., concurring in part and concurring in the judgment). In performing this analysis, we must determine if the Legislature had a reasonable basis for concluding that the sentencing framework advanced the goals of South Dakota's criminal justice system in any substantial way. *See Ewing*, 538 US at 28, 123 SCt at 1189, 155 LEd2d 108 (quoting Solem v. Helm, 463 US 277, 297 n22, 103 SCt 3001, 3013, 77 LEd2d 637 (1983)). Then, we consider whether the sentence of a particular defendant is grossly disproportionate to the crime committed. *Id*. A prison sentence is not grossly disproportionate if it furthers the State's retributive and correctional goals reflecting "a rational legislative judgment, entitled to deference." *Id*. at 30, 123 SCt at 1190, 155 LEd2d 108.

[¶75.]     One would be hard pressed to conclude that a legislative scheme creating a ten-year maximum sentence for photographing a child in an obscene act could ever be considered excessive. Certainly, the Legislature can "with reason conclude that the threat posed to the individual and society" from this activity, dangerous to the welfare of children, is bad enough to warrant deterrence and retribution through a ten-year prison term. *See Harmelin*, 501 US at 1003, 111 SCt at 2707, 115 LEd2d 836 (Kennedy, J., concurring in part and concurring in the judgment). Child pornography is a pernicious societal affliction. It is nothing less than the vile depiction of abused, exploited children for lascivious purposes.

[¶76.]     To quote the Supreme Court, "The legislative judgment, as well as the judgment found in relevant literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental

health of the child." Osborne v. Ohio, 495 US 103, 109, 110 SCt 1691, 1696, 109 LEd2d 98 (1990) (quoting New York v. Ferber, 458 US 747, 756-58, 102 SCt 3348, 3354, 73 LEd2d 1113 (1982) (citations omitted)). Child pornography not only harms children in its production, but also "causes the child victims continuing harm by haunting the children in years to come." *Id.* at 111, 110 SCt at 1697 (citation omitted). Sentencing for these offenses should reflect the harm the child victims have suffered. United States v. Sherman, 268 F3d 539, 547-48 (7thCir 2001) (the children portrayed in pornography are the primary victims). In comparing the "gravity of the offense" to the "harshness of the penalty," I conclude that the question of whether a ten-year maximum penalty for this kind of child exploitation is itself grossly disproportionate must be answered in the negative. *Ewing,* 538 US at 28, 123 SCt at 1179, 155 LEd2d 108.

[¶77.]     What must be decided next is whether the "stacking" of sentences creates an issue of gross disproportionality. Defendant committed five separate felonies by videotaping five separate minors. He cites no authority for the notion that he has a state or federal constitutional right to concurrent sentences for five separate crimes resulting from five separate acts. Nonetheless, for legitimate proportionality review, the question remains whether we should examine separately each sentence imposed or whether we should examine the cumulative sentences. We have no definitive guidance from the Supreme Court. Indeed, the Supreme Court's diverse Eighth Amendment proportionality analyses "have not established a clear or consistent path for courts to follow." Lockyer v. Andrade, 538 US 63, 72, 123 SCt 1166, 1173, 155 LEd2d 144 (2003). In rejecting challenges to long prison

sentences in *Harmelin* and *Ewing*, a majority of the Court could not agree in any single opinion. Until the Supreme Court adopts a more consistent approach, I would prefer to examine precedent on consecutive sentence analysis from those jurisdictions that have specifically considered the issue.

[¶78.]        Several courts have concluded that a gross disproportionality review must be performed for each separate sentence, not the cumulative total. United States v. Schell, 692 F2d 672 (10thCir 1982), United States v. Aiello, 864 F2d 257 (2dCir 1988); Pearson v. Ramos, 237 F3d 881 (7thCir 2001); Close v. People, 48 P3d 528 (Colo 2002). As the Supreme Court of Iowa wrote, "There is nothing cruel and unusual about punishing a person committing *two* crimes more severely than a person committing only one crime, which is the effect of consecutive sentencing." State v. August, 589 NW2d 740, 744 (IA 1999) (emphasis in original). Likewise, the Arizona Supreme Court concluded that "if the sentence for a particular offense is not disproportionately long, it does not become so merely because it is consecutive to another sentence for a separate offense or because the consecutive sentences are lengthy in aggregate." Arizona v. Berger, 134 P3d 378 (Ariz 2006) (citation omitted) (mandatory consecutive sentences amounting to 200 years imprisonment for 20 counts of possession of child pornography was not cruel or unusual). I find these cases persuasive. Each sentence should be reviewed individually. Otherwise, proportionate sentences for separate crimes could always become potentially

disproportionate only because the sentences are ordered to be served consecutively.[22]

[¶79.]     The only question remaining, then, is whether, in this particular case, an eight-year sentence for each of defendant's separate crimes is grossly disproportionate. On this point, I do not believe that these sentences meet the standard of the "exceedingly rare" and "extreme" case, in which the grossly disproportionate principle should be invoked. Lockyer v. Andrade, 538 US 63, 73, 123 SCt 1166, 1173-74, 155 LEd2d 144 (2003). Defendant was producing child pornography for his personal use. In doing so, he filmed his daughter and her adolescent friends. Also, under the guise of dispensing "therapy," he cornered two of the girls in his basement for hours in an effort to convince them to show him their breasts and to share erotic thoughts with him. These girls also reported that he exposed himself to them and touched them inappropriately. Considering all the circumstances, an eight year prison term for each offense, two years less than the maximum penalty, is not grossly disproportionate to the crimes he committed. Thus, with no finding of gross disproportionality our review ends.

---

22.    I am not suggesting that we should never consider the consecutive nature of sentences in a proportionality challenge. There may be times when such consideration would be appropriate. For example, consecutive sentences amounting to life in prison or for convictions on several offenses committed simultaneously may be such instances. In this case, however, defendant committed his offenses over a period of time with different victims, causing separate and distinct harm in each instance, and his prison terms do not add up to a life sentence.

**II.**

[¶80.]     Aside from the question of proportionality, I must say, nonetheless, that the new sentences defendant received on remand strike me as problematic, considering that his videotapes are not the most serious type of child pornography, and he had no prior sex offense convictions, not to mention that most other child pornography offenders have received lesser sentences under the federal court guidelines, in the courts of other states, and in our own circuit courts.  In its analysis, this Court compares cases where the offenders were also convicted of child rape and molestation.  That is not the case here.  Where I part with the dissenters, however, is in their insistence that defendant's reduced prison terms must still be set aside as cruel and unusual.  Once we conclude that a sentence is not grossly disproportionate, we must abjure the result we think more fitting and defer to the sentencing judge's evaluation of the offender.  Neither the South Dakota Constitution nor the Constitution of the United States authorizes us to dictate to sentencing courts what we believe to be an *exactly* proportionate sentence.  Those questions must be left to the Legislature and to the circuit courts themselves.

[¶81.]     In recent years, this Court has reviewed several child pornography convictions.  These cases had sentences ranging from a brief jail term to a punishment of one hundred years in the penitentiary.  In State v. McKinney, 2005 SD 74, 699 NW2d 460, the offender received one hundred years on twenty counts, but he was also convicted, in a related case, of first-degree rape, sexual contact with a child, and sexual exploitation of a minor.  On the other hand, in *State v. Martin*, 2003 SD 153, 674 NW2d 291, the offender was convicted of thirty counts in two

counties and faced a possible sentence of sixty years if all the sentences for the convictions were made consecutive. He received a concurrent total of forty-five days in jail and ten years probation. *See also* State v. Christensen, 2003 SD 64, 663 NW2d 691 (two counts of possession of child pornography: one year each to run concurrently). These sentences reflect a broad disparity.[23] It is true that Martin and Christensen were sentenced at a time when the maximum penalty for possession of child pornography was two years. But in neither case were the sentences for their multiple crimes ordered to be served consecutively.

[¶82.] Other than legislatively set maximum penalties and sex offender psychological evaluations, judges have little else to guide them in making sentencing decisions for these types of offenses. It would be helpful for the Legislature to give courts some additional guidance on sentencing offenders possessing numerous child pornography images. Considering the speed with which large numbers of these images can be downloaded from the Internet, consecutive sentences for each image could become astronomical. *See* United States v. Richardson, 238 F3d 837 (7thCir 2001) (possession of 70,000 images of child pornography downloaded from Internet). Without further legislative direction, conspicuous sentencing disparities for these cases will only persist. Child pornography will always generate an innate revulsion, but it is important that sentencing in these cases follow a logical methodology, so that the punishment fits

---

23.     The same issue has been noted in federal sentencing decisions under the Sentencing Reform Act of 1984. Rick Gallagher, *Downward Departures: Curing the Lenient Sentencing of Internet Child Pornographers and Statutory Rapists*, 5 UC Davis J Juv L & Pol'y 111 (Winter 2000).

the offense and the offender, and like offenses and offenders are punished similarly. State v. Bonner, 1998 SD 30, ¶13, 577 NW2d 575, 579. Unwarranted leniency and excessive punishment both generate disrespect for the law.

[¶83.] As an adjunct to the principles commonly used in deciding a proper sentence, I recommend that courts look at two additional determinants when assessing the seriousness of a child pornography offense: (1) the specific nature of the material and (2) the extent to which the offender is involved with that material.[24] In the first category, nature of the material, seriousness can range from lewd depictions of nudity, to indecent posing, to adult-child sexual interaction (e.g., rape, molestation), to depictions of sadism or bestiality. *See, e.g.*, United States v. Richardson, 238 F3d 837, 839 (7thCir 2001) (pictures depicting "bondage and torture of children"). In the second category, extent of involvement, seriousness can range from simple possession, to trading or bartering, to commercial production and distribution. It stands to reason that the more depraved and invasive the abuse and the more involved the offender is with the material depicting it, the greater the seriousness of the offense.

[¶84.] Under these criteria, defendant's videotapes, though disgusting and reprehensible, do not fall into the most serious category of child pornography. Most of them depict surreptitious filming of minors engaging in ordinary bathroom and toilet activities. And, although defendant was himself creating and editing these videos, there was no evidence that he was circulating them in any manner.

---

24. *See* Sentencing Advisory Panel, The Panel's Advice to the Court of Appeal on Offenses Involving Child Pornography (August 2002).

Accordingly, I stand by our earlier decision in the first appeal of this case to remand for resentencing. It was not so much a question whether defendant should be punished sternly as whether he should be punished in line with what other like offenders have received. Imposing the maximum prison terms for these crimes, as the circuit judge did in the first instance, violates the principle that only the most serious commissions of an offense deserve the most serious penalty. *Bonner*, 1998 SD 30 at ¶25, 577 NW2d at 583. On the other hand, as the circuit court recognized, there were additional considerations that still bear on the present reduced sentences, including the fact that defendant is the father of one of the girls he filmed, and his improper behavior with two of her friends indicates that he was trying to sexually exploit them, both physically and psychologically.

SABERS, Justice (dissenting).

[¶85.]     I dissent. This Court remanded Blair's case with a direct command to the circuit court: resentence Blair taking into account the factors set forth in *State v. Bonner*, 1998 SD 30, 577 NW2d 575 and *State v. Hinger*, 1999 SD 91, 600 NW2d 542. The circuit court ignored this command and engaged in a "pick and choose" analysis whereby it addressed and accentuated only those facts that supported Blair's excessive sentence. Today, this Court upholds the "pick and choose" analysis and does little to address whether Blair's excessive sentence is consistent with the Eighth Amendment. If this excessive sentence stands, it sends a message to the State to keep building more and bigger prisons.

[¶86.]     In *Bonner*, we abandoned the "shock the conscience test" in favor of a two pronged analysis. 1998 SD 30, 577 NW2d 575. As an initial matter, we

"determine whether the sentence appears grossly disproportionate." *Id.* ¶17. Our review examines "the conduct involved, any relevant past conduct, with utmost deference to the Legislature and the sentencing court." *Id.* Central to this analysis is the sentencing court's duty to "reserve the most severe sanctions for the *most serious combinations of the offense* and the *background of the offender.*" *Id.* ¶25, 577 NW2d at 582 (emphasis added).

[¶87.]     We reversed and remanded the circuit court's original sentence of fifty years. On remand, the circuit court was ordered to engage in a proportionality analysis and resentence Blair taking into account the factors set forth in *Bonner*, and *Hinger*, 1999 SD 91, 600 NW2d 542. As mentioned, *Bonner* is our seminal case concerning issues of proportionality. However, on remand, the circuit court described *Bonner* and our decision to reverse the fifty-year sentence as follows:

> The initial determination that the sentence may be grossly disproportionate is apparently made by the Supreme Court, without the benefit of seeing and hearing the defendant, the victims, or other witnesses in the case. The initial determination is, in the opinion of this court, merely the "shock the conscience" test under another name. A justice looks at the nature of the crime without knowing much about it, and looks at the prior record of the defendant, and makes a subjective judgment that this sentence "may be" grossly disproportionate, and remands the case for further findings by the trial court.

The circuit court clearly disagreed with our decision to remand this matter, as well as the law which the circuit court was obligated to apply.[25] Unfortunately, the circuit court's decision is plagued by its initial sentiments, resulting in a sentence

---

25.     The circuit court wrote a lengthy decision and it will not be reproduced in this dissent. However, the circuit court on many occasions remarked that this Court's procedures concerning proportionality were "awkward" and "subjective."

for Blair that is grossly disproportionate to his crimes.  Fifty years with ten years suspended upon certain conditions is, for all practical purposes, the same sentence the circuit court set in the first proceeding.

[¶88.]    Gross Disproportionality

[¶89.]    *Nature of the offense*

[¶90.]    Before it was repealed, SDCL 22-22-23 made it a class four felony to "photograph or film a minor under the age of sixteen years engaging in a prohibited sexual act . . . ."  SDCL 22-22-22 defined what acts constituted a "prohibited sexual act."  Most of the conduct criminalized included causing or directing minors under the age of sixteen to engage in "intercourse, anal intercourse, bestiality, sadism, fellatio, etc."  However, the statute also encompassed nudity, standing alone, as a prohibited sexual act if the nudity was depicted "for the purpose of sexual stimulation or gratification of any person who might view such depiction."  SDCL 22-22-22.  Ultimately, SDCL 22-22-23 through SDCL 22-22-24 were targeted at punishing individuals who were engaged in the manufacture, sale, possession, or distribution of child pornography.

[¶91.]    We do not condone Blair's conduct.  However, the Legislature did not intend the surreptitious photographing or video recording of persons using the bathroom to be the most serious violations of SDCL 22-22-23.  None of these girls were aware that they were being recorded.  Blair did not cause any of these girls to engage in "intercourse, bestiality, sadism, fellatio, etc."  Instead, he recorded these girls engaging in common every day functions such as showering and using the

toilet.[26] The court service officer in this case was experienced in dealing with sex offenders. In his summary, he noted that Blair's crime "did not rank very high in the scheme of sex crimes."

[¶92.] The circuit court recognized that there was no sexual contact in this case. However, it compared Blair's conduct to that of a man who had forcibly raped a woman causing her psychological injuries. According to the circuit court, Blair's crimes could be just as psychologically damaging as cases in which there was forcible sexual contact. The circuit court also compared this case to *State v. Spack*.[27] In Spack, the defendant was charged with twenty counts of third degree rape, nine counts of photographing a child in an obscene act, and nine counts of possession of child pornography. Spack raped a thirteen-year-old girl numerous times and photographed her while she was performing fellatio on him. Additionally, law enforcement recovered a note from the victim to Spack that indicated if he were to allow her to go out on a given night he could do anything to her except "put it in her butt."

[¶93.] Blair's conduct does not rise to the level of Spack's, or any defendant who commits multiple rapes or sexual assaults. The State alleges no actual or attempted sexual contact on the part of Blair.[28] Surreptitious recording is not

---

26. One girl was filmed masturbating with a hairbrush. However, she did not do so at the direction of Blair.

27. Pennington County file number 01-832.

28. The plurality opinion recites an allegation that Blair exposed himself to two of the girls. However, that claim remained disputed throughout these proceedings.

equal to photographing a minor while being raped. In fact, nudity standing alone, no longer constitutes "a prohibited sexual act" under the South Dakota Codified Laws.[29] Because Blair's conduct falls far short of the most serious commission of this crime, the circuit court erred in this regard.

[¶94.] The plurality opinion does little to address the circuit court's rationale behind its sentence. Instead, in a manner that is barely distinguishable from the State's brief, it makes a series of bold, unsupported pronouncements. For example, the plurality opinion labels Blair as "an attempted child molester." It does so despite the fact that the State did not allege or charge attempted sexual assaults. The plurality opinion spends a great deal of time discussing the horrors of manufacturing and distributing child pornography. While we agree with those general propositions, there is no evidence in the record that Blair was involved in any way with disseminating any of these videos. Therefore, we disagree with the circuit court and the plurality that this severe sentence was reserved for the most serious commission of the crime.

[¶95.] *Background of the Offender*

[¶96.] We noted in *Bonner* that the lack of a prior felony conviction or other serious offense aids our decision and "certainly bears on the question of gross

---

29. The plurality claims Blair's conduct would still constitute a crime under the current statutory scheme. *See* plurality opinion at n10. However, the plurality's claim is based on the premise that Blair videotaped these girls for the purpose of watching them defecate and urinate. *See* SDCL 22-24A-2 (defining a prohibited sexual act as "*defecation or urination for the purpose of creating sexual excitement in the viewer.*") There is no evidence that Blair videotaped these girls to watch them use the bathroom. Nor did the State, victims, counselors, judge, etc. mention such a claim. Instead, Blair videotaped these girls for the purposes of seeing them nude.

disproportionality." 1998 SD 30, ¶23, 577 NW2d at 581-82. As mentioned, our order to the circuit court required that it consider this case in light of the principles set forth in *Bonner*. On remand, the circuit court mentioned that Blair had no prior felony convictions. Remarkably, the circuit court considered Blair's lack of a prior felony conviction "irrelevant."

[¶97.] Apparently, the circuit court decided that Blair's prior misdemeanor convictions supported the sentence. His misdemeanor record included a conviction for disorderly conduct, three convictions for insufficient funds checks less than one hundred dollars, a conviction for driving while intoxicated, and a violation of a boating regulation. The prosecutor stated at the sentencing hearing that she did not believe Blair had a significant criminal history. The circuit court disagreed.

[¶98.] The circuit court cited *State v. Stahl*, 2000 SD 154, 619 NW3d 870, in holding that numerous misdemeanor convictions may support a sentence at the harsher end of the spectrum. Stahl had "nineteen prior misdemeanor convictions and three violations of the terms of suspended sentences." *Id.* ¶6, 619 NW2d 872. Stahl's record spanned twenty-four years and included offenses such as simple assault, furnishing alcohol to a minor, three DUI's, reckless driving, and open container. *Id.* Stahl also admitted past use of marijuana, methamphetamine and LSD. *Id.* Despite all of this, the circuit court found "no significant difference between Stahl's prior record and the defendant's [Blair's]."

[¶99.] Unlike the circuit court, I find significant differences between Stahl and Blair's criminal records. The most obvious is that Stahl has over three times as

many misdemeanor convictions. Additionally, Stahl was convicted of a violent crime and admitted to major drug use.

[¶100.] The plurality opinion notes that the circuit court characterized the lack of a prior felony conviction as "irrelevant." However, the plurality opinion goes on to conclude that "a fair reading of the record indicates the circuit court heavily discounted this factor in comparison to the other relevant factors it considered." *See* plurality opinion ¶34. Apparently, the plurality opinion believes a literal reading of the record would be "unfair." More importantly, *Bonner* required the circuit court to consider the lack of a prior felony conviction. By using the term "irrelevant," the circuit court did not believe the lack of a prior felony conviction was worthy of consideration. The circuit court erred in rejecting *Bonner* and comparing Blair's criminal background to that of Stahl. This most severe sentence was not reserved for the most serious background of the offender.

[¶101.] *Remorse & Rehabilitation Prospects*

[¶102.] A pre-sentence investigation was done and the results were given to the sentencing judge.[30] Blair had a consistent employment history and had worked as a counselor, youth care director, social worker, and in computer networking. The

---

30. The court service officer in this case was highly experienced. Although his report is not binding on either the circuit court or this Court, it deserves some consideration. We have used the results of a pre-sentence report to support a defendant's sentence. *See* State v. McKinney, 2005 SD 73, ¶12, 699 NW2d 471, 476; Ganrude v. Weber, 2000 SD 96, ¶11, 614 NW2d 807, 810. It would offend notions of justice if we were to dismiss, without grounds, a report when the results are favorable to the defendant.

pre-sentence investigator found no allegations of improper conduct while Blair was working in those capacities.

[¶103.] In his evaluation, the pre-sentence investigator wrote:

> Mr. Blair is before the Court on his first felony. He was very emotional during our interview and cried openly on several occasions. I have no doubt that he is remorseful for his actions and the hurt he caused his victims, their families, his family and himself.

The pre-sentence investigator, a seasoned court service worker, noted that "in the scheme of sex crimes, this does not rank very high. . ." He recommended that Blair receive a considerable amount of incarceration time with most of it suspended upon specific conditions.

[¶104.] The record includes Dr. Mary Curran's counseling notes. On at least six different occasions, Dr. Curran noted that Blair had accepted responsibility for his acts and "knows he has no one to blame but himself." The court service officer also believed Blair was remorseful. On remand, however, the circuit court concluded Blair had lied to both Curran and the court's service officer.

[¶105.] The plurality upholds this "credibility determination," even though the circuit court was never privy to any of the conversations. In fact, the court never heard testimony on these issues or even referred to Curran's notes in its decision. Nor did the prosecutor object or offer any argument in regards to the counseling notes. Under these circumstances, I would not afford the same level of deference to these findings as the plurality. Additionally, it is important to recognize that Blair pleaded guilty to every charge brought forward by the State. How can the plurality and the circuit court conclude that he has not taken responsibility for his crimes?

[¶106.] Finally, the circuit court wanted Blair's sentence to ensure that his "daughter was of sufficient age when [he] got out that [he] would no longer be any kind of threat to her." One of the goals of sentencing is to remove incorrigible offenders from society. State v. Bult, 529 NW2d 197, 200 (SD 1995) (*Bult III*). However, as mentioned earlier, Blair's conduct did not include sexual contact or violence. Nor has there been a showing that Blair is incapable of rehabilitation. At the time this incident occurred, Blair's daughter was thirteen years old. Blair was forty-two years old. If Blair was to serve even one-half of his forty-year sentence, his daughter would be thirty-three and he would be sixty-two. The circuit court's sentence greatly exceeds its interest in ensuring Blair's daughter would be of sufficient age upon Blair's release.

[¶107.] In terms of rehabilitation, the plurality highlights only those facts that are adverse to Blair. Blair was convicted of photographing a child in an obscene act; a sex crime. Thus, the most important test results in terms of rehabilitation would be the Sex Item Truthfulness Scale. As to those findings, Dr. Curran concluded:

> Cameron scored in the Low Risk Range (0 to 39 percentile) on Sex Item Truthfulness Scale (Risk Percentile 20). He was truthful when responding to test items having an obvious sexual connotation and relationship. With regard to sexual areas of inquiry, the sex related scale scores are likely accurate and valid.

Rather than focus on whether Blair was truthful in relation to matters collateral to the convictions, the proper focus should have been his rehabilitation prospects in terms of the *crimes for which he was convicted.* The circuit court essentially rejected the positions of the experienced court service officer, Dr. Curran, the prosecutor, the South Dakota cases submitted for proportionality review, this

Court's decisions in *Bonner* and *Hinger*, and this Court's order of reversal and directions on remand. We should reverse and remand this matter again.

Conclusion

[¶108.] Our order made clear that the circuit court was to reconsider this sentence in accordance with *State v. Bonner*. The circuit court did not do so. Instead, it rejected *Bonner* and rejected the opinions of disinterested parties involved with this case. The result is a sentence that is greater than the sentences for those who have committed rapes and molested children.[31] The circuit court did not reserve "the most severe sanctions for the *most serious combinations of the offense* and the *background of the offender*." *Bonner*, 1998 SD 30, ¶25, 577 NW2d at 582 (emphasis added).[32]

---

31. In *In re* L.S., 2006 SD 76, ¶4, __ NW2d __, this same circuit court judge sentenced a defendant for felony child abuse and suspended *all but six months* of the sentence. The child abuse charge included three allegations of actual sexual contact in which the defendant asked a young girl to touch his penis and "moved up and down" while she was sitting on his lap.

   Seven months ago, we reversed a circuit court's order suppressing evidence in State v. Helland 2005 SD 121, 707 NW2d 262. Helland possessed dozens of pornographic images entitled "hot boys" and "teen boys," which depicted little boys with their legs spread. Helland was charged with twenty counts of possession of child pornography and faced a possible one hundred years in prison.

   On remand, Helland pleaded guilty to four counts of possessing child pornography. This same circuit court judge sentenced Helland. At the sentencing hearing, Helland admitted that he continues to possess child pornography despite the fact that the proceedings against him had been ongoing for two years. Ultimately, the same circuit court judge suspended all but six months of Helland's sentence.

32. *Proportionality Review* -- On remand, Blair submitted several cases of other defendants who had been convicted of photographing a child in an obscene

(continued . . .)

#23463

[¶109.]     If we are to continue to recognize a proportionality principle in Eighth

Amendment cases, circuit courts should not be permitted to pick and choose facts

that support their original sentence and ignore those facts that do not support the

sentence.[33]  I would reverse the sentence and remand with instructions to the

Presiding Judge of the Second Judicial Circuit to assign Blair's case to a different

_____

(. . . continued)

act.  The prosecutor offered no cases and did not submit a brief distinguishing any of the cases submitted by Blair.  Only one of the defendants in those cases received sentences as severe as Blair.  That defendant photographed a young girl during the course of multiple rapes over a three-year period.  He also pleaded guilty to being a habitual offender.  Because Blair's sentence appears grossly disproportionate, I would remand so another judge could conduct a proper proportionality analysis.

33.     The author of the concurrence in result is the author of the *Bonner* decision.  That is why it is troubling that the concurrence in result upholds Blair's sentence despite noting that "it is important that sentencing in these cases follow a logical methodology, so that the punishment fits the offense and the offender, and like offenses and offenders are punished similarly . . . unwarranted leniency and excessive punishment both generate disrespect for the law."  Concurrence In Result at ¶82.  The concurrence in result goes on to conclude that Blair's offense does not "fall into the most serious category . . . ."  *Id.* ¶84.  Despite all of this, it upholds Blair's sentence on the grounds that we should not examine the sentence in the aggregate, but examine each conviction individually.

Whether we measure one grain of sand or one tree at a time, a desert remains a desert and forest remains a forest.  Similarly, in this case, five eight-year sentences to be served consecutively amount to a forty-year sentence, *i.e.*, a sentence that does not fit the offense or the offender, and a sentence that was imposed in an illogical manner, inconsistent with *Bonner* and its progeny.  This case undermines the fundamental principle behind the *Bonner* decision: the words "Equal Justice Under Law" call for more than just a lofty inscription.  *Bonner*, 1998 SD 30, ¶12, 577 NW2d 575, 578.  Writing a concurrence in result may technically preserve *Bonner* as precedent, but for all practical purposes, *Bonner* is dead in this case.  Finally, if "review ends" in a finding that Blair's sentence does not even appear grossly disproportionate, why did it take a thirty-three page decision and a nine page concurrence in result to rationalize around it?

judge for proper sentencing.  *See* State v. Bult, 544 NW2d 214, 217 (SD 1996) (Bult *IV*).  Considering all factors objectively, Blair's sentence should not exceed twenty five years.  After all, that is a quarter of a century for surreptitiously recording teenage girls while they used the bathroom.

[¶110.]        MEIERHENRY, Justice, joins this dissent.